Raymond J. **DONOVAN,** Secretary of Labor, United States Department of Labor, **Plaintiff-Appellant,**

v.

Jerry **BRANDEL,** Individually, and d/b/a Jerry Brandel Farms, et al., **Defendants-Appellees.**

No. 83–1228.

United States Court of Appeals, Sixth Circuit.

Argued March 29, 1984.

Decided June 15, 1984.

Paula W. Coleman, Joseph M. Woodward, U.S. Dept. of Labor, Linda Jan S. Pack, Claire White (argued), Washington, D.C., Michael A. Alaimo, U.S. Dept. of Labor, Cleveland, Ohio, for plaintiff-appellant.

Walter Urick, Urick & Monton, Hart, Mich., Richard M. Van Orden (argued), Tolley, Fisher & Verwys, Grand Rapids, Mich., for defendants-appellees.

Before KENNEDY and JONES, Circuit Judges, and CHURCHILL, District Judge.[*]

CHURCHILL, District Judge.

This is an appeal from an order denying the Secretary of Labor's ("Secretary") complaint for an injunction against violations of the Fair Labor Standards Act of 1938, 29 U.S.C. § 201–219 ("FLSA"). The Secretary claimed that the defendant Jerry Brandel, individually and doing business as Jerry Brandel Farms ("Brandel"), had since 1974 continually violated the child labor[1] and recordkeeping[2] provisions of FLSA in connection with harvesting of his pickle crops.

A single issue of whether the migrant pickle harvesters were the "employees" of Brandel so as to trigger the provisions of the FLSA was tried by the Honorable Benjamin F. Gibson of the Western District of Michigan. The trial judge concluded that the migrant workers were independent contractors and not employees of Brandel. The Secretary claims error in such determination.

The FLSA defines "employee" as "any individual employed by an employer". 29 U.S.C. § 203(e)(1). The term "employ" is defined as "to suffer or permit to work".

---

[*] Hon. James P. Churchill, United States District Judge, Eastern District of Michigan, sitting by designation.

[1] § 12(a) and § 15(a)(1) of FLSA prohibit the transportation in commerce of goods produced by the employment of oppressive child labor. 29 U.S.C. § 212(a) and § 215(a)(1).

[2] § 11(c) and § 15(a)(5) require employers under the act to maintain records of the persons employed and of their wages, hours and other conditions of employment. 29 U.S.C.A. § 211(c) and § 215(a)(5).

29 U.S.C. 203(g). This Court has previously addressed these broad definitions as requiring a judicial interpretation of the boundaries of the Act's applicability: In *Dunlop v. Carriage Carpet Co.*, 548 F.2d 139, 143–45 (6th Cir.1977):

> The Fair Labor Standards Act of 1938 was enacted by Congress to be a broadly remedial and humanitarian statute. The Act was designed to correct "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers ..."
>
> In interpreting [the FLSA] the courts have construed the Act's definitions liberally to effectuate the broad policies and intentions of Congress ...
>
> ... "The terms 'independent contractor', 'employee', and 'employer' are not to be construed in their common law senses when used in federal social welfare legislation ... Rather, their meaning is to be determined in light of the purposes of the legislation in which they were used." [I]n the application of such legislation employees are those who as a matter of economic reality are dependent upon the business to which they render service. (Citations omitted).

According to *Carriage Carpet Co.*, economic dependence may be the ultimate controlling factor in a given situation for finding an employment relationship. Another panel of this Court has emphasized that in examining a particular factual setting the total relationship must be examined, rather than isolated factors. *Dunlop v. Dr. Pepper-Pepsi Bottling Co.*, 529 F.2d 298 (6th Cir.1976). The issue of the employment relationship does not lend itself to a precise test, but is to be determined on a case-by-case basis upon the circumstances of the whole business activity. *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947).

Moreover, the determination of whether a particular factual setting gives rise to coverage under the FLSA is a matter of law. *Castillo v. Givens*, 704 F.2d 181 (5th Cir.1983). The trial court here made findings of fact which are, for the most part, undisputed. The Secretary challenges the conclusion that such facts did not give rise to an employment relationship as a matter of law.

The facts as found by the trial court may be summarized as follows:

Brandel operates a diversified farming operation and employs full-time and seasonal workers for most aspects thereof. With respect to the harvesting of his pickle crop, however, he has contracted with the heads of migrant families[3]. A migrant family contracts to harvest a particular field of pickles, although Brandel supplies irrigation and pesticides as he determines to be necessary upon notification of the need for such by the migrants[4]. The harvesting period spans 30–40 days. The migrants receive 50% of the proceeds from the sale of such pickles to commercial processors. The price for the pickles is set unilaterally by the processors in advance of the harvest season. Most of the migrants are paid weekly their share of the proceeds.

This method of "subcontracting" was found to have been implemented because of the unique aspects of pickle marketing. Unlike most other crops, the market price of the pickles does not increase proportionately with their size, i.e., there are seven specific size grades, and the smaller pickles bring a higher price per pound than larger pickles. Paying harvesters on a piecework basis had proved to be less profitable because of the extensive and ineffective supervision it required.

The migrant workers are assisted to some extent by their children in the fields, although it was found that the younger children spend more of their time playing than working. Training of the children by

---

**3.** Although we use the term "migrant", the evidence at trial showed that some harvesting families were local families.

**4.** The contracts between Brandel and a harvesting family required that all harvesting be done by family members.

the adults begins with their helping carry containers for the pickles and furnishing drinking water, and they progress gradually to an active role in the harvesting of the fruit from the vine. The Court found that the migrants' primary purpose in bringing their children to Brandel's fields was the opportunity to develop basic skills and family unity.

The trial court went on to make specific findings with respect to various factors which the parties agree should be considered in making the determination of employee status. These factors are 1) the permanency of the relationship between the parties; 2) the degree of skill required for the rendering of the services; 3) the worker's investment in equipment or materials for the task; 4) the worker's opportunity for profit or loss, depending upon his skill; and 5) the degree of the alleged employer's right to control the manner in which the work is performed[5]. See *Real v. Driscoll Strawberries Associates, Inc.,* 603 F.2d 748 (9th Cir.1979).

We examine each of these findings in turn, along with the parties' contentions as to their propriety and their import to the trial court's determination that the migrant farm workers were not proven to be employees under FLSA.

### 1) Permanency of the relationship

The trial court found that the vast majority of harvesters have only a temporary relationship with Brandel. Within the 30–40 day harvest season, the contracting worker determines how long he will participate in the harvest. "While a pickle crop can be harvested seven or more times, some contractors remain only through the fifth picking. Although approximately 40–50% of the harvesters return to Brandel annually, this factor is no more indicative of the employment relationship than when a businessman repeatedly uses the same subcontractors due to satisfaction with

past performance". The court concluded that the relationship between Brandel and the workers was not one of a permanent nature.

The Secretary cites cases which have found other farm laborers to be employees, but none which have presented a finding of lack of a permanent relationship. Furthermore, the record fully supports such finding in this case. Brandel testified that some of the migrant workers would contact him in advance of the harvest season to inquire about securing a commitment to harvest that year, while others would simply arrive in the area and visit his farms to negotiate for a plot of land. The testimony of the intervening defendants[6] indicates that several of them held full-time jobs elsewhere and considered their jobs as migrant farm workers to be opportunities for supplementing their income if their family situation allowed.

A pretrial stipulation also established that of the 36 family units which had both contracted for harvesting pickles (as independent contractors) and picked strawberries (as employees) for Brandel in the years 1977–80, 24 had harvested pickles for only one year.

The record supports the trial judge's conclusion that the annual return of migrant families to Brandel's fields was a product of a mutually satisfactory arrangement rather than the permanent relationship between them.

### 2) The degree of skill required

The trial court found that an experienced harvester possesses a degree of skill in both the care of the pickle plants and judgment in the picking of the fruit itself. The Secretary argues that this finding is erroneous inasmuch as it is based upon testimony to the effect that the greater the harvester's experience, the greater the yield

---

**5.** A sixth factor discussed by the parties and the case law is whether the service rendered is an integral part of the alleged employer's business. Although the trial court made no specific finding on this factor, it will be discussed in this opinion.

**6.** Nine of the contracting migrant workers were allowed to intervene as defendants by the district court. See *Usery v. Brandel,* 87 F.R.D. 670 (W.D.Mich.1980).

from the field. He further contends that the testimony that such work is skilled was not entitled to weight.

The Secretary does not dispute that the harvesters engage in three basic operations: 1) rowing the vines, which involves laying the vines parallel to the row of plants and tucking them to the base of the plant, thereby exposing the fruit on one side of the plant for picking; 2) blocking the vines, which involves weeding between the plants and thinning them so as to allow adequate spacing; and 3) the picking, which requires the harvester to distinguish between seven different grades of size, as well as ripeness. The defendants presented testimony that the contracting of the harvesting phase of the pickle farming process has had the effect of delegating to the migrant workers the responsibility of supervising their own field labor, i.e., the migrant workers assume responsibility for the day-to-day operation so as to insure that production is maximized. The proofs were also uncontroverted in establishing that the judgment necessary to productively manage the harvesting of the pickles will not develop without at least one season's experience.

The trial judge's determination of the migrant workers' skill must be evaluated with reference to the task being performed pursuant to the contract. As the record clearly establishes, the harvesting of pickles is most profitable when numerous picking of the smaller grade pickles are conducted. Experienced harvesters achieve this goal with mastery of the methods of rowing, blocking and picking for the smaller grades of pickles. The harvesters must also be watchful of the crops' needs for irrigation and insecticide, as they alone are in daily charge of the field. The Court is satisfied that the trial judge was not clearly in error in finding that knowledge of these methods of maximizing production constituted a skill of the laborers setting them apart from harvesters of other crops[7].

### 3) The workers' capital investment

A pretrial stipulation of the parties stated that each individual harvester's capital investment in their work with Brandel consisted of their pails and gloves. It further appears that Brandel has a substantial capital investment in specialized equipment for his pickle farming operations[8]. Brandel also owns tractors and implements thereto, irrigation equipment and trucks used in transporting goods to markets. It appears that this latter group of equipment is used throughout Brandel's farming enterprise, i.e., its use is not limited to the harvesting and marketing of pickles and, in fact, the hauling of pickles to market is a function separate from harvesting of the crop.

The trial court determined that the relatively small investment by the migrant workers did not require a finding of an employment relationship, apparently rejecting this factor as not particularly probative on the issue of the context of the pickle industry. The Secretary urges that the Court erred in ignoring the substantial disparity in capital investments between the parties.

While there can be no doubt that the primary investment in the pickle farming operation is Brandel's, he has little capital invested in the equipment and materials required for the farm workers' task of harvesting the pickles. The capital investment factor is most significant if it reveals that the worker performs a specialized ser-

7. The Court is mindful of the determination by the Supreme Court in *Rutherford Food Corp. v. McComb, supra,* that there may be a fine line between pieceworking and skilled labor: "While profits to the boners depended upon the efficiency of their work, it was more like piecework than an enterprise that actually depended for success upon the initiative, judgment or foresight of the typical independent contractor". 331 U.S. at 730, 67 S.Ct. at 1476.

In this regard, the Court notes that the unique record before it presents competent evidence that such skills exist and provide the justification for the relationship at issue.

8. Brandel testified that he owns a grading station on his farm that consists of scales and grade sorting equipment housed in a building and used to sort the pickles for transport to market. The total cost of this building and equipment was said to be $62,000–$72,000.

vice that requires a tool or application which he has mastered or that the worker is simply using implements of the landowner to accomplish the task. The system of harvest here employed eliminates the need for heavy capital investment. While the factor may be important in other contexts, we agree with the trial court that it is not determinative of the issue of employment in this case.

#### 4) Opportunity for profit or loss

The trial court concluded that the migrant workers have an opportunity for profit in that their compensation would be greater if they succeeded in maximizing the production of the smaller pickles. The court further added that "[t]he possibility of loss exists because the harvester must harvest enough pickles to cover his transportation and living expenses."

The Secretary argues that the record does not support a conclusion that the workers have any such opportunity for profit or loss. He urges that the inquiry is whether there is a possibility of a loss of a capital investment and, further, that the testimony of Brandel showed that he (Brandel) paid the harvesters for the pickles in 1980 even though he was unable to sell them at market.

This Court agrees that there is little, if any, evidence in the record to support the finding that these workers are actually exposed to any risk of loss. Nevertheless, it is clear that their remuneration increases by their successful managing of the harvest process. It is also evident from the record that the sharecropping relationship at issue has flourished in the context of pickle farming in Michigan precisely because it fosters efficient production of pickles. Where untrained pieceworkers are employed to harvest such fields, constant supervision is required to guard against picking of only the largest pickles. Where machinery is employed to harvest, a single picking causes irreparable damage to the plants, precluding further pickings and also damages some of the gathered fruit.

The record is clear that the opportunity for greater earnings based upon management of the fields exists. Such opportunity is not solely a function of a piecework method of compensation.

#### 5) Brandel's right to control

The trial court found that the evidence established that the sharecropping arrangement was designed to and did effectively relinquish control of the harvesting operation from Brandel to the migrant workers. He noted that the parties would negotiate for a particular parcel of land to be assigned to the migrants and for Brandel to plant the pickles at a time of year so as to accommodate a family's summer schedule. Brandel does not appear in the fields to supervise the day-to-day harvesting and does not dictate the hours or methods by which the migrant families go about their work.

The Secretary contends that the court erred in focusing its attention on the harvesting phase of the operation and ignoring the pervasive control exercised by Brandel over the entire pickle farming operation. This Court believes, however, that the trial court properly evaluated the control issue as whether Brandel retains the right to dictate the manner in which the details of the harvesting function are executed. The witnesses were consistent in characterizing the essence of the sharecropping arrangement as a design to relinquish control of the harvesting to the migrant worker.[9] The intervening defendants testified that they considered themselves independent contractors and would not work for Brandel under conditions whereby he supervised them.

The record supports the finding of Brandel's lack of right to control the details of the harvesting.

A final factor, which was not specifically addressed by the trial court, may be wheth-

**9.** Representatives of the Michigan farming industry and the Michigan Employment Security Commission testified to the development of the practice as one based upon economic considerations. Further, the trial court recognized the trend towards subcontracting major aspects of farming operations such as plowing, crop dusting and grain harvesting.

er the service rendered is an integral part of the alleged employer's business. See *U.S. v. Silk,* 331 U.S. 704, 716, 67 S.Ct. 1463, 1469, 91 L.Ed. 1757 (1947). The Secretary contends that harvesting is an integral part of any farmer's business, i.e., that it is work created solely as a result of Brandel's planting and growing and preliminary to his transporting of the crops to market.

So characterized, the task of harvesting can be viewed as integral to a farming operation. However, the Court believes that the concept of a task being "integral" to an operation is only one factor in determining the question of employment status. A central question is the worker's economic dependence upon the business for which he is laboring. Although the harvesters' compensation is directly related to the price brought by marketing of the pickles, Brandel has no control over such prices. The testimony at trial indicated that these migrant harvesters are in demand throughout the picklefarming region of Michigan and could perform similar work at other farms should the necessity arise. Furthermore, the trial judge found that the harvesters neither work long hours nor earn low "wages" [10]. On this record, we cannot say they are economically dependent upon Brandel's business.

It would appear from the Secretary's arguments by brief and orally that he seeks a result tantamount to a *per se* rule that all migrant farm workers are employees subject to the FLSA. Such contention disregards the premise that the inquiry be made on a case-by-case basis and the unique and comprehensive factual record presented in this case.[11] Viewing the entire circumstances of the relationship as discussed above, and construing the term "employee" with reference to the purposes of the FLSA, the court is satisfied that the lower court properly concluded that the workers are not "employees" under FLSA.

The judgment of the district court is AFFIRMED.

---

**10.** The harvesters earn the equivalent of $6.00–$9.00 per hour.

**11.** The Court notes the contrary result in a similar factual situation in *Donovan v. Gillmor,* 535 F.Supp. 154 (N.D.Ohio 1982), appeal dismissed

708 F.2d 723 (6th Cir.1982). That decision, rendered upon a motion for summary judgment, was made upon a record strikingly different that the thorough and pointed evidence in this case.