Jose CAVAZOS, et al., Plaintiffs,

v.

William FOSTER, Sr., d/b/a William Foster Company, Defendant.

No. 4:92–CV–55.

United States District Court,
W.D. Michigan, S.D.

May 21, 1993.

**439**

Philip R. Riley, Michigan Migrant Legal Assistance Project, Inc., Berrien Springs, MI, for plaintiffs.

Richard M. Van Orden, Richard M. Van Orden, PC, Grand Rapids, MI, John E. Dewane, Butzbaugh & Dewane, St. Joseph, MI, for defendant.

### OPINION

QUIST, District Judge.

The named plaintiffs in this class action are forty two (42) migrant farm workers. They have brought this action against defendant William Foster Sr., doing business as the William Foster Company, ("Foster"), an agricultural enterprise that plants over 1000 acres in pickling cucumbers in the states of Michigan and Missouri. Plaintiffs claim that the defendant company pays less than minimum wages, provides substandard housing, and evades Social Security responsibilities with respect to members of the plaintiff class.

Plaintiffs have moved for partial summary judgment. Foster has filed a cross-motion for summary judgment on the issue of whether plaintiffs are "employees" pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., and the Agricultural Worker Protection Act ("AWPA"), 29 U.S.C. § 1801 et seq.

### Background Information

Plaintiffs are migrant workers who have worked for Foster as pickle harvesters. Many of the plaintiffs have worked for Foster during the pickle harvest period for several years and have worked for him in both Missouri and Michigan. The work plaintiffs performed included straightening vines, cleaning rows, picking pickles, and sorting, grading, and packing pickles.

In either 1985 or 1986, Foster first required plaintiffs to sign a contract that describes plaintiffs as "independent contractors." The contract provides that for the work of "harvesting of pickles and the maintaining of vines" assigned to them, plaintiffs will be paid according to a schedule that pays a better price for pickles of the most desirable sizes. After Foster began using the contract, he provided the pickle harvesters with 1099 independent contractor forms for the wages earned for pickle picking and W–2 forms for hourly work such as grading, sorting, and packing pickles. Prior to that time, the pickle harvesters were treated as employees and were provided with W–2 forms for all the work they performed for Foster.

Plaintiffs' brief in support of their motion for partial summary judgment provides a chronological description of the pickle production cycle. Their account is supported by references to the deposition testimony of William Foster, Sr., the owner of the defendant company, and William Foster, Jr., its general manager, and Foster has raised no objections to plaintiffs' description of the pro-

cess. I will briefly summarize the process as described by plaintiffs.

The first step is generally for Foster to contract for the sale of the prospective pickle crop. Foster negotiates price, quantity, size, and delivery and enters into sales contracts with several buyers. Plaintiffs have no input into this contracting process and do not assume any risk of loss under any of the contracts.

The second step is to select and prepare the fields for planting and then to plant the fields. Plaintiffs play no role and have no investment in this process. Foster makes the decisions regarding the land, equipment, and procedures to use. He buys the seed, owns or leases the land and the equipment that is used to plow, disk, drag, fertilize, and plant the fields, and he pays hourly wages to the workers who perform these tasks.

In the 50 to 55 days it takes the vines to produce pickles for harvest, Foster cultivates, irrigates, and applies fertilizers and other chemicals. Again, plaintiffs have no role in this process. Foster decides what steps to take, owns or leases the equipment needed, and pays hourly wages to those who perform these tasks.

Migrant farm workers begin to arrive as the pickle crop reaches maturity. Foster assigns to the head of each family the rows his family is to pick. Once the rows are assigned, the pickers are expected to spend one or more days straightening or lining the vines in their rows to make the vines more productive and easier to pick. This work does not require a capital investment in tools. According to William Foster, Sr., it is generally performed with a long stick. When harvesting begins, Foster has container boxes delivered to the ends of the rows with a forklift. Plaintiffs pick into pails and empty the pails in Foster's boxes. As boxes are filled with pickles, Foster transports them by forklift to a grading station to be sorted and weighed. Foster maintains that plaintiffs are responsible to supply their own buckets. Plaintiffs allege that Foster supplied and did not require plaintiffs to purchase many of the buckets they used.

Foster owns the grading stations and the equipment used to transport the boxes. He employs hourly-wage employees to perform these tasks. At the grading stations, the pickles are sorted into different grades and oversize pickles are eliminated before the pickle harvesters' wages are computed. Hourly wage earners perform the sorting, grading, and packing tasks. Plaintiffs receive wages computed on a graded scale for the pickles they harvest. Foster then completes the process by shipping the pickles to the buyers.

### Standard for Summary Judgment

Summary judgment is appropriate if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56. The rule requires that the disputed facts be material. Material facts are facts which are defined by substantive law and are necessary to apply the law. A dispute over trivial facts which are not necessary in order to apply the substantive law does not prevent the granting of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The rule also requires the dispute to be genuine. A dispute is genuine if a reasonable jury could return judgment for the nonmoving party. *Id.* This standard requires the nonmoving party to present more than a scintilla of evidence to defeat the motion. The summary judgment standard mirrors the standard for a directed verdict. The only difference between the two is procedural. Summary judgment is made based on documentary evidence before trial, and directed verdict is made based on evidence submitted at trial. 477 U.S. at 250–51, 106 S.Ct. at 2511. A moving party who does not have the burden of proof at trial may properly support a motion for summary judgment by showing the court that there is no evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If the motion is so supported, the party opposing the motion must then demonstrate that there is a genuine issue of material fact for trial. *Id.* The Court must draw all inferences in a light

most favorable to the non-moving party, but the Court may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle,* 967 F.2d 233, 236 (6th Cir.1992) (quoting *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

This case is ripe for a determination on summary judgment because there are no disputed issues of material fact. Foster does not take issue with plaintiffs' description of the pickle growing and harvesting process except to disagree with plaintiffs' assertion that he sometimes lent pails to plaintiffs rather than selling them. Whether the pails were purchased is not material, as I will discuss below. Plaintiffs, for the most part, built their record on undisputed documents and on the testimony of William Foster, Sr., and William Foster, Jr. Although the parties disagree about how the facts are to be characterized, neither has put forward any issue of fact that is in dispute and would preclude summary judgment.

## ANALYSIS

Foster argues that the decision of the court in *Donovan v. Brandel,* 736 F.2d 1114 (6th Cir.1984), requires summary judgment in his favor. Like this case, the *Brandel* case involved the issue of whether migrant pickle harvesters should be considered "employees" or "independent contractors." In *Brandel* the court of appeals affirmed the determination of the trial judge that the migrant workers were independent contractors. The appellate court, however, pointedly limited its conclusion to the facts of the case. It emphasized that the issue should be assessed on a case-by-case basis and commented that a "unique and comprehensive factual record" supported the trial court's determination. *Id.* at 1120. The court also declined to reverse "the contrary result in a similar factual situation in *Donovan v. Gillmor,* 535 F.Supp. 154 (N.D.Ohio 1982), *appeal dismissed,* 708

F.2d 723 (6th Cir.1982)" and commented that the *Gillmor* decision, "rendered upon a motion for summary judgment, was made upon a record strikingly different that [sic] the thorough and pointed evidence in [the *Brandel* ] case." *Id.* at 1120 n. 11.[1]

After *Brandel* was decided, several district courts within the Sixth Circuit have held that migrant workers are employees. *See Colunga v. Young,* 722 F.Supp. 1479, 1485 (W.D.Mich.1989) (Hillman, J.), *aff'd,* 914 F.2d 255 (6th Cir.1990) (migrant tree trimmers are employees under FLSA, FICA, and AWPA for purposes of minimum wage, social security, and unfair labor practice claims); *Mendez v. Brady,* 618 F.Supp. 579, 582 (W.D.Mich.1985) (Hillman, J.) (migrant blueberry pickers are employees under FLSA); *Caballero v. Resmer,* No. 88–CV–10231, slip op. at 5–7 (E.D.Mich., March 6, 1991) (migrant pickle workers are employees and not independent contractors for purposes of minimum wage and social security payments); *Salinas v. Birkhold,* No. C87–7531, slip op. at 17 (N.D.Ohio, Oct. 6, 1988) (migrant pickle workers are employees under AWPA).

Courts in other jurisdictions have likewise ruled that migrant workers are employees. *See Brock v. Lauritzen,* 624 F.Supp. 966 (E.D.Wis.1985); *aff'd, Secretary of Labor, U.S. Dept. of Labor v. Lauritzen,* 835 F.2d 1529, 1538 (7th Cir.1987), *cert. denied,* 488 U.S. 898, 109 S.Ct. 243, 102 L.Ed.2d 232, *reh'g denied,* 488 U.S. 987, 109 S.Ct. 544, 102 L.Ed.2d 574 (1988) (pickle farmworkers are employees under FLSA); *Castillo v. Givens,* 704 F.2d 181 (5th Cir.1983), *cert. denied,* 464 U.S. 850, 104 S.Ct. 160, 78 L.Ed.2d 147 (1983) (cottonfield workers are employees of the agribusiness entity under FLSA); *Real v. Driscoll Strawberry Associates, Inc.,* 603 F.2d 748 (9th Cir.1979) (strawberry workers are employees and not independent contractors under FLSA); *Aviles v. Kunkle,* 765 F.Supp. 358, 364 (S.D.Tex.1991) (pickle harvesters were employees within meaning of AWPA and FLSA and not independent contractors), vacated for lack of personal jurisdiction, 978 F.2d 201 (5th Cir.1992); *Yeska v.*

---

1. Following the *Brandel* decision, the United States District Court for the Northern District of Ohio reaffirmed its *Donovan v. Gillmor* decision,

*sub nom.,* in *Marshall v. Gillmor,* No. C79–163, slip op. at 7 (N.D.Ohio, Dec. 4, 1986).

*State, Labor and Industry Review Comm'n,* 149 Wis.2d 363, 440 N.W.2d 823 (App.1989) (pickle harvesters not independent contractors but covered employees under state unemployment law); *S.G. Borello & Sons, Inc. v. Department of Indus. Relations,* 48 Cal.3d 341, 769 P.2d 399, 256 Cal.Rptr. 543 (1989) (*en banc*) (pickle harvesters not independent contractors but employees covered by state worker's compensation law); *In re Wage and Hour Violation of Kokesch and Maresch,* 411 N.W.2d 559 (Minn.App.1987) (pickle harvesters not independent contractors, but employees covered by Minnesota minimum wage law).

■ In *Brandel, Gillmor,* and the other cases that have addressed the issue of whether migrant farm workers are employees, the courts have generally considered six criteria:

(1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;

(2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;

(3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;

(4) whether the service rendered requires a special skill;

(5) the degree of permanency and duration of the working relationship;

(6) the extent to which the service rendered is an integral part of the alleged employer's business.

*Lauritzen,* 835 F.2d at 1535; *Brandel,* 736 F.2d at 1117 & n. 5. When these factors are considered under the undisputed facts of this case, the distinctions between the instant case and *Brandel* are apparent.

■ In addition to the differences in the role and status of the workers in *Brandel,* the procedural history of the *Brandel* case differs dramatically from the instant case and the other reported migrant worker cases. *Brandel* was brought by the Secretary of Labor against the farm owner on a child labor charge. Harvesters included local families as well as migrant workers. 736 F.2d at 1116 n. 3. Nine of the contracting harvesters intervened on the side of the owner and

joined him in arguing that they were independent contractors. *Id.* at 1117 n. 6. In contrast, the workers in the instant case dispute the status Foster assigned to them.

### (1) Defendant's Right to Control

Foster asserts that he relinquishes control of the harvest to the migrant workers. In his brief he claims that he "has a coordinator in the field to coordinate box disbursal and pick up but not to supervise the harvesting function" and that he "does not dictate the hours and harvesters are free to work when they want." (Def.Br. at 8).

In many respects, however, Foster retained control of the crop during the harvest period. Foster continued to be responsible for irrigation and for the health of the vines. He assigned the rows that the workers were to harvest and retained the power to fire workers. In deposition, William Foster, Sr., said he was in the fields all the time during the harvest period and that, while in the fields, he checked for disease, checked on the irrigation equipment, and checked to see if the workers were there. (Foster Sr. dep. at 75). Moreover, as William Foster, Jr. stated in his deposition, the harvesters cannot work when they want to but, instead, can work only when Foster sets out the boxes near their rows. They cannot pick rows in another field that are ready if the general manager has not allocated collection boxes to that field. (Foster Jr. Dep. at 54–57, 76.)

Foster's degree of involvement in the harvest contrasts with that in *Brandel,* where the harvesters negotiated for the rows assigned to them and negotiated the time the pickles were planted so that the harvest time would fit into their schedule. The *Brandel* harvesters were also responsible to determine the need for irrigation and insecticide. 736 F.2d at 1118–19. In the instant case, the workers had no role in determining the time of planting or the particular rows that would be assigned them. Moreover, they did not have total control over the vines during the harvest time. Their lack of control supports plaintiffs' claim that they are employees.

## (2) Harvesters' Opportunity for Profit or Loss

The payment method dictated by the parties' employment contract provides that the harvesters are paid for what they pick without regard to whether Foster loses money or makes a profit on the pickle sales. Thus, the instant case contrasts with the agreement in *Brandel,* by which the harvesters were to receive 50% of the proceeds from the pickle sales under a sharecropper agreement. 736 F.2d at 1116.

Foster admits that his harvesters have no risk of loss. He claims, however, that they have the opportunity to make a profit. "Because of the system under which payment is made based on size and shape, the harvester in essence does participate in a percentage of the profits from the sale of the pickles." (Def.Br. at 6–7.) The payment system which pays more for correct-sized pickles is, however, nothing more than a sophisticated piecework payment system. It provides a mechanism for the grower to control the timing and quality of the harvest through the harvesters' pocketbooks rather than by direct supervision. It does not afford plaintiffs an opportunity for profits but merely provides a system by which harvesters can earn higher wages by following correct harvesting practices.

## (3) Harvesters' Capital Investment

At most, the only equipment a harvester is required to provide is a $2.00 bucket into which the pickles are picked and transported to the collection boxes. In *Brandel,* the capital investment of the workers was similar. The *Brandel* parties stipulated that the workers were required to supply pails and gloves. 736 F.2d at 1118. The trial court in *Brandel* determined that the owner also had little invested in the harvesting process and the appellate court concluded that the worker's capital investment could not be determinative in this context. *Id.* In the instant case, there is evidence that the Foster's investment in the harvest process itself far exceeds that of the workers because Foster supplies collection boxes for deposit of the pickles as they are harvested and forklifts to move the pickles out of the fields. The harvesters' investment in pails is insignificant even in comparison to Foster's investment in the collection boxes he places in the fields. If this Court considers only Foster's investment in the harvesting process, as the *Brandel* court did, and not his total investment in the pickle crop, as seems more appropriate, the facts of this case support a finding that plaintiffs are employees under the criteria of capital investment.

## (4) Harvesters' Skill

The only human capital the migrant workers are expected to contribute is their native intelligence, their willingness to work long hours in the fields, and the labor of their family members. There is no educational requirement. Moreover, as William Foster, Sr., admitted, the fundamentals of pickle harvesting can be learned in half a day. (Foster Sr. Dep. at 76.) This record contrasts with the record in *Brandel* where uncontroverted evidence was presented that, under the system established on that farm, "the judgment necessary to productively manage the harvesting of the pickles will not develop without at least one season's experience." *Id.* Without the "unique record" of *Brandel,* plaintiffs qualify as employees under the criteria that measures human capital. *See also Lauritzen,* 835 F.2d at 1537 (the level of skill required for picking pickles does not set the pickle harvester apart from the harvester of other crops).

## (5) Permanency and Duration of the Relationship

In this instance, the degree of permanency is remarkably high for seasonal work. Foster has admitted that approximately 70% of the harvesters are returns from the previous year. (Def.Br. at 3) The return rate in *Brandel* was around 40% to 50%. 736 F.2d at 1117. Foster has also acknowledged that plaintiffs work for Foster for approximately 120 days a year, significantly longer than the 30 to 40 days harvesters worked in *Brandel. Id.* Thus, there is stronger evidence of permanency in the instant case than in *Brandel.*

The difficult question is what significance to give this degree of permanency. In *Brandel,* the court stated that the return of harvesters "is no more indicative of the employment relationship than when a businessman

repeatedly uses the same subcontractors due to satisfaction with past performance." *Id.* In contrast, the *Lauritzen* court observed, "Many seasonal businesses customarily hire only seasonal employees, but that fact alone does not convert seasonal employees into seasonal independent contractors." 835 F.2d at 1537. The *Gillmor* court concluded that "the exclusive, season long relationship between the migrants and defendants is sufficient indicia of permanency in an industry such as harvesting, an industry that is inherently seasonal." 535 F.Supp. at 162. Here we have an exclusive relationship between plaintiffs and Foster for a long season, coupled with a tendency to return to Foster's employment year after year. If the criteria of permanency has any meaning, it should weigh in favor of an employee relationship in this instance.

### (6) Harvesting Integral Part of Business

Foster concedes that harvesting is an integral part of his business but argues that this should not be determinative of employment statutes. The *Brandel* court held that harvesting was an integral part of the farming operation but that it did not require the court to reverse the trial court because it is "only one factor in determining the question of employment status." 736 F.2d at 1120. In this instance, it is yet another factor supporting the conclusion that plaintiffs are employees.

### *Statutory Purpose*

After treating as nondeterminative several of factors traditionally considered in assessing employment status, the *Brandel* court suggested that a more fundamental standard be applied. Looking to the language and history of the statute, the court stated that "the central issue is the worker's economic dependance upon the business for which he is laboring." *Id.* at 1115–16. The court concluded that, on the record, it could not say the workers were dependent. *Id.* at 1120. The focus on dependency, however, does not really provide an alternative to the standard applied above. In the case quoted by *Brandel,* the Supreme Court, in discussing dependency, directs the assessment back to the factors of control, profit and loss, capital investment, skill, and permanency. *Bartels*

*v. Birmingham,* 332 U.S. 126, 130, 67 S.Ct. 1547, 1550, 91 L.Ed. 1947 (1947) (citing *United States v. Silk,* 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947)).

The concurring opinion in *Secretary of Labor, U.S. Dept. of Labor v. Lauritzen,* 835 F.2d 1529 (7th Cir.1987) more explicitly called for the abandonment of the six criteria and evaluation, instead, based on the purpose of the FLSA. Judge Easterbrook suggested, "We should abandoned the unfocused 'factors' and start again. The language of the statute is the place to start." 835 F.2d at 1543.

As both opinions point out, the FLSA is a broadly remedial statute. The FLSA defines "employee" as "any individual employed by an employer," 29 U.S.C. § 203(e)(1). Its definition of "employ" includes "to suffer or permit to work." 29 U.S.C. § 203(g). The *Brandel* court, addressing "the boundaries of the Act's applicability," noted that the FLSA "was designed to correct labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 736 F.2d at 1116.

The *Lauritzen* concurring opinion addressed both the purpose of the statute and the purposes of the independent contractor doctrine. It noted that the independent contractor doctrine is a tort law principle "designed to identify who is answerable for a wrong (and therefore, indirectly, to determine who must take care to prevent injuries).... This usually follows the right to control the work." 835 F.2d at 1544.

In applying these principles to migrant farm workers, Judge Easterbrook stressed lack of physical or human capital, stating:

The migrant workers are selling nothing but their labor. They have no physical capital and little human capital to vend. This does not belittle their skills.... But those to whom the FLSA applies must include workers who possess *only* dedication, honesty, and good health. So the baby-sitter is an "employee" even though working but a few hours a week, and the writer of novels is not an "employee" of the publisher even though renting only human capital. The migrant workers labor on the farmer's premises, doing repeti-

tive tasks. Payment on a piecework rate ... would not take these workers out of the Act, any more than payment of the sales staff at a department store on commission avoids the statute.

*Id.* at 1545. The concurrence concludes with a call to end the case-by-case balancing and declare that "migrant farm hands are 'employees' under the FLSA—without regard to the crop and the contract in each case." *Id.*

The advantages of Judge Easterbrook's approach are compelling. *See Fegley v. Higgins,* 760 F.Supp. 617, 622 (E.D.Mich.1991) (commends Judge Easterbrook's approach and suggests its utility for cases involving homeworkers). The burden of litigating employment status should not be imposed on migrant workers and could be avoided if it was clear that the FLSA applied in all but the most exceptional of cases. In the instant case, plaintiffs qualify as employees under any test.

### CONCLUSION

For the reasons stated above, plaintiffs' motion for partial summary judgment (docket # 37), declaring them to be "employees," is GRANTED. Defendant's counter-motion for summary judgment (docket # 45) is DENIED. An Order consistent with this Opinion will be issued.