**Daniel M. BONNETTS, Plaintiff,**

v.

**ARCTIC EXPRESS, INC., Defendant.**

**No. 96 CV 00834.**

United States District Court,
S.D. Ohio,
Eastern Division.

June 11, 1998.

Tony C. Merry, McCarthy Palmer Volkema Boyd & Thomas, Columbus, OH, for Plaintiff.

Roger Philip Sugarman, William J. Brown, O. Judson Scheaf, Kegler, Brown, Hill & Ritter, Columbus, OH, for Defendant.

## OPINION AND ORDER

MARBLEY, District Judge.

### INTRODUCTION

This matter comes before the Court on Plaintiff's Motion for Partial Summary Judgment (doc. 16) and Defendant's Motion for Summary Judgment (doc. 17). Plaintiff, Daniel M. Bonnetts ("Bonnetts"), filed this action against Defendant, Arctic Express, Inc. ("Arctic"), alleging violation of his rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601. The Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331. For the reasons set forth below, Plaintiff's Motion for

Partial Summary Judgment is **DENIED** and Defendant's Motion for Summary Judgment is **DENIED**.

## FACTUAL BACKGROUND

Bonnetts is a 55 year old male who has been an over-the-road truck driver for more than 20 years. In October, 1994, Bonnetts answered an Arctic advertisement recruiting drivers by appearing at Arctic headquarters in Hilliard, Ohio, for an orientation program discussing the Arctic driving program ("October Orientation"). Bonnetts admits that at the time of the October Orientation he was aware that Arctic was recruiting only "contract" drivers, whom the company regarded as independent contractors, as opposed to "company" drivers, who were deemed employees of Arctic.

It is undisputed that Arctic treated the two classes of drivers, contract and company, differently in many ways. First, company drivers were compensated on a per-mile basis, while contract drivers were free to choose between per-mile and percentage-of-shipment compensation. Second, company drivers were permitted to participate in certain company benefits, such as pension plans, profit sharing, health, life and disability insurance, from which contract drivers were expressly prohibited. Third, unlike company drivers, contract drivers were not under a "forced dispatch" and were free to refuse any loads offered.

At the end of the orientation, Bonnetts was offered a chance to become a contract driver for Arctic, which he accepted on October 24, 1994. The terms of the working arrangement between the parties were set forth in two documents: (1) Lease/Purchase Option at Termination ("Lease"); and (2) Independent Contractor Motor Vehicle Lease Agreement ("Contract"). Under the Lease, Bonnetts agreed to lease,[1] with an option to purchase, a truck from D & A Associates ("D & A"), an affiliate of Arctic. Bonnetts also agreed to sub-lease the truck to Arctic for use in hauling loads. It is undisputed that the agreements did not provide Bonnetts ownership or title to the truck.

Under the Contract, Bonnetts was responsible, *inter alia*, for such things as:

(1) route selection.

(2) fuel, maintenance, and repairs for the truck;

(3) purchase of any special equipment necessary for loading and unloading goods;

(4) license plate fees;

(5) vehicle insurance;

(6) operating credentials and special permits.

The Contract also required that Bonnetts maintain with Arctic an escrow account of approximately $1,200, pending final settlement of all transactions between the parties upon termination of the Contract.

Additionally, Arctic agreed not to exercise its right to request progress calls during a haul "so as to unreasonably interfere or violate [Bonnetts'] right to select routes or his right in general to exercise the discretion and judgment of an independent contractor ..." Under the terms of the Contract, Bonnetts was also permitted to hire another driver for his truck without the express permission of Arctic, provided that driver possessed the minimum qualifications of the United States Department of Transportation.

Finally, the Contract contained the following clause:

> It is clearly understood and agreed, and it is the intention of the parties hereto, that [Bonnetts] is and continues to be an independent contractor, and is not the employee of [Arctic], for any purpose whatsoever. Nothing herein contained shall be construed as inconsistent with that statute. Neither [Bonnetts] nor the employees, agents or servants of [Bonnetts] are to be considered employees, agents or servants of [Arctic], at any time, under any circumstances, or for any purpose.

Bonnetts signed the agreements on October 20, 1994, and became a contract driver

---

**1.** It should be noted that Bonnetts was not required to lease a tractor from D & A. In fact, the Contract explicitly states that leasing a tractor from D & A was not a condition precedent to entering into an agreement with Arctic to transport loads. Bonnetts was free to lease or buy a tractor from any source available.

for Arctic. Bonnetts elected to be compensated on a percentage-of-shipment basis at first, later changing to the per-mile basis.

For the majority of Bonnetts' tenure with the company, Arctic's payments to Bonnetts were reflected on IRS Form 1099, a form specifically designated by the IRS for independent contractors. However, Steven Russi, Executive Vice President and General Counsel for Arctic, testified in his deposition that there were three days in 1995 when Bonnetts was treated as a company driver. From October 25–28, 1995, Bonnetts used a company truck to make his deliveries due to the fact that his own truck was under repair. Russi testified that during this period of time, because Arctic payed for all expenses related to the use of its truck, Arctic considered Bonnetts to be a company driver, or an employee. A similar situation, involving a switch from contract to company driver, occurred on December 20, 1995.

On January 9, 1996, Bonnetts was injured while transporting a load for Arctic. He notified Arctic of the accident, indicating that he thought he could finish the trip with the cargo. Realizing that he was unable to complete the trip, Bonnetts drove the truck to Oaklawn, Illinois, where he parked the loaded vehicle on the street by his daughter's condominium, and informed Arctic of his stop. Arctic immediately dispatched a driver to Oaklawn, who picked up the truck and finished the route.

On January 12, 1996, Dan Bangor, an Arctic manager, contacted Bonnetts to inform him that Arctic was terminating the Contract and repossessing the leased truck. Bangor then faxed a Termination Agreement to Bonnetts that same day, which Bonnetts refused to sign. Notwithstanding this refusal and the fact that Bonnetts was current on his lease payments, Arctic dispatched a tow truck on January 12, 1996, to repossess the leased truck. Following the repossession, Bonnetts had one or more conversations with personnel from Arctic, including Russi, but his truck was never returned.

Bonnetts filed the instant action in the Franklin County Court of Common Pleas on August 9, 1996, alleging the following claims: (1) FMLA; (2) Federal Insurance Contributions Act ("FICA"); (3) Handicap Discrimination (under state law); (4) Unjust Enrichment (under state law); and (5) Wrongful Discharge (under state law). Arctic removed the case to federal court on August 23, 1996 based on federal question jurisdiction under FMLA and FICA. Bonnetts has since withdrawn all but his FMLA claim, which is the matter currently before this Court on cross motions for summary judgment.

## LEGAL ANALYSIS

### Standard For Summary Judgment

Rule 56 provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.,* 12 F.3d 1382, 1388–89 (6th Cir.1993). The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 339–40 (6th Cir.1993). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (Summary judgment appropriate where the evidence could not lead a trier of fact to find for the non-moving party).

In evaluating such a motion, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26

L.Ed.2d 142 (1970). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson,* 477 U.S. at 251, 106 S.Ct. 2505, *Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir.1995).

### Whether Bonnetts is an "Employee" under FMLA

The issue before this Court is whether Bonnetts qualifies for protection under the FMLA. The FMLA incorporates, by reference, the definition of "employee" found in the Fair Labor Standards Act ("FLSA"). 29 U.S.C. § 2611(3). The definition of "employee" under the FMLA and, by incorporation FLSA, is necessarily broad to effectuate the remedial purposes of the Acts. *United States v. Rosenwasser,* 323 U.S. 360, 363, 65 S.Ct. 295, 89 L.Ed. 301 (1945). The Sixth Circuit has adopted the "economic realities" test for determining whether an employment relationship exists between parties for the purposes of FLSA. *Donovan v. Brandel,* 736 F.2d 1114, 1116 (6th Cir.1984). The "economic realities" test

> looks to whether the putative employee is economically dependent upon the principal or is instead in business for himself This test is a loose formulation, leaving the determination of employment status to case-by-case resolution based upon the totality of the circumstances.

*Lilley v. BTM Corp.,* 958 F.2d 746, 750 (6th Cir.1992) (citations omitted).

■ Under the "economic realities" test, a court must consider the following six (6) factors in determining whether an employment relationship exists: (1) the permanency of the relationship; (2) the degree of skill required for the particular job; (3) the worker's capital investment; (4) the opportunity for profit or loss; (5) the employer's fight to control; and (6) whether the worker was an integral part of the employer's business. *Brandel,* 736 F.2d at 1117–20. The Court now directs its attention to each of these factors.

### The Permanency of the Relationship

In considering the permanency of the relationship between an employer and a worker, this Court must look to the express terms of the Contract, which define such things as the length of the relationship, and the means by which the relationship can be extended or, conversely, terminated.

It is clear that the express terms of the parties' Contract provide for an at-will employment relationship of indefinite duration, but terminable at any time. The Court finds that the relationship between the parties was not one of a permanent nature, and, therefore, indicative of an independent contractor relationship.

### The Degree of Skill Required for the Particular Job

■ While specialized skills are certainly not the exclusive province of the independent contractor, courts consider possession of such skills to be relevant in determining whether workers are employees or independent contractors. *Dole v. Snell,* 875 F.2d 802, 811 (10th Cir.1989). The lack of required specialized skills or knowledge is considered indicia of an employer-employee relationship. *Id.*

A finding that a worker possesses specialized skills is not, however, determinative. Courts have found workers with specialized skills to be employees under FLSA, where those workers were not able to use their skills in an independent manner, either free from the employer's control or distinctive from others considered to be employees. *See Martin v. Selker Brothers, Inc.,* 949 F.2d 1286, 1295 (3d Cir.1991); *Snell,* 875 F.2d at 811; *Brock v. Superior Care, Inc.,* 840 F.2d 1054, 1060 (2d Cir.1988); *Sec'y of Labor, United States Dept. of Labor v. Lauritzen,* 835 F.2d 1529, 1537 (7th Cir.1987).

■ It is undisputed that driving a truck containing large loads of cargo requires a significant degree of skill. The job requires the skill of handling a large vehicle, detailed knowledge of the national roadways, and a high level of stamina to be able to make long trips without fatigue. As demonstrated by the cases cited above, however, this issue is

intimately tied to the amount of control Arctic exerted over Bonnetts, which, as set forth below, is an open factual issue in this case. If Arctic exerted significant control over Bonnetts' route selection and other aspects of his job, then it cannot be fairly said that Bonnetts used his skills in an independent manner consistent with an employer-independent contractor relationship as defined under FLSA. Conversely, if the evidence establishes that Arctic exerted little or no control over Bonnetts' performance of his duties, then a finding of independent contractor status would be warranted.

### The Worker's Capital Investment

■ The Court must consider whether Bonnetts had a significant capital investment in his business enterprise to determine whether he had an opportunity for profit or loss. *See Lauritzen,* 835 F.2d at 1537. Significant expenditures are indicative of the operation of an independent business enterprise by the worker; small expenditures, or labor itself, is not sufficient to sustain a finding. *Id.*

Bonnetts argues that he did not have any capital investment in a business enterprise. He contends that he did not own the truck, but rather leased the truck from Arctic. Since he had no employees other than himself, Bonnetts argues that he did not have a real business operation.

Arctic contends that the Lease and Contract, taken together, contradicts Bonnetts' position. According to Arctic, Bonnetts did not lease the truck from it, but rather from D & A, an Arctic affiliate, with an option to purchase. Bonnetts then sub-leased the truck to Arctic for use in connection with their routes. Second, Arctic claims that the Contract expressly provided that Bonnetts was responsible for almost all of his operating expenses, including insurance, fuel and maintenance. Finally, Arctic argues that Bonnetts was free, without any input from Arctic, to hire additional drivers and employees to help him perform his duties under the Contract.[2]

The Court finds that the evidence weighs in favor of an employer-independent contractor relationship. While it is true that Bonnetts leased the truck, and cannot be said to have owned it, his situation is more analogous to that of an owner-operator than a company driver because, unlike company drivers, Bonnetts was responsible for the operating and maintenance expenses related to the truck. In *United States v. Silk, et al.,* 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947), one of the respondents operated a trucking business. The company required that the truck drivers: (1) haul exclusively for the company; (2) furnish their own trucks and all equipment and labor necessary to pick up, handle and deliver shipments; (3) pay all expenses of operation, including any insurance that the company may request; (4) paint the company logo on their trucks; (5) collect from the shippers or consignees any amounts due to the company and turn over such collected amounts to the company immediately following the route; (6) post a bond with the company in the amount of $1,000 and a cash deposit of $250 pending final settlement of all accounts between the company and the trucker; and (7) take a short instruction course on the company's methods of doing business. *Id.* at 708–09, 67 S.Ct. 1463. Also, the company instructed the truck drivers where and when to pick up freight. The truck drivers were paid on a percentage-of-shipment rate. The Supreme Court held that the truck drivers were independent contractors:

> [W]e agree ... that where the arrangements leave the driver-owners so much responsibility [sic] the investment, and management as here, [driver-owners] must be held to be independent contractors. These driver-owners are small businessmen. They own their own trucks. They hire their own helpers. In one instance, they haul for a single business, in the other for any customer.... It is the total situation, including the risk undertaken, the control exercised, the opportunity for profit from sound management, that marks

---

2. As set forth below, Bonnetts disputes this claim. Bonnetts testified at his deposition that he approached Arctic about leasing another truck and hiring a driver. According to Bonnetts, Arctic rejected the idea.

**983**

these driver-owners as independent contractors.

*Id.* at 719, 67 S.Ct. 1463 (footnotes omitted).[3]

Conversely, in *Tobin v. Anthony–Williams Mfg. Co.*, 196 F.2d 547 (8th Cir.1952), the Eighth Circuit held that truck drivers who financed the purchase of their trucks from a lumber production company were employees under FLSA. The case, however, is distinguishable from the case *sub judice* in many respects. First, the lumber company determined the size of the cargo loads, which, in turn, meant that the company also controlled the drivers' compensation per route. Second, there was no discernable difference between the operations of the drivers and two admitted employee-drivers of the company. Although the drivers were required to hire their own cargo loaders, the company raised the drivers' compensation in an amount equal to what the company had originally paid to the cargo loaders, who were formerly employed and paid by the company; i.e. the company reimbursed the drivers for the expense of hiring additional employees.

Furthermore, this Court finds no difference between Bonnetts' lease payments for his truck and the rental payments a company makes for leasing office space. Both are considered overhead capital expenditures for the business enterprise. Unlike the migrant farm workers in *Lauritzen*, who were required only to provide their own gloves,[4] Bonnetts was responsible for providing a truck and all other necessary tools in order to provide shipping services for Arctic. The fact that he chose to lease a truck from an Arctic affiliate is of no consequence, as the Contract expressly provides "[Bonnetts was] not required to purchase or rent any products, equipment or services from [Arctic] as a condition of entering into [the Contract] . . ."

*The Opportunity for Profit or Loss*

■ Next, the Court considers whether Bonnetts had the opportunity to maximize his profits through the independent use of his own initiative, judgment, and skill. *See, e.g., McComb*, 331 U.S. at 730, 67 S.Ct. 1473; *Lauritzen*, 835 F.2d at 1536; *Brandel*, 736 F.2d at 1119. The Court must also consider whether Bonnetts had a corresponding exposure to a risk of loss. *Id.* Evidence demonstrating the possibility of a reduction in the amount of money earned is insufficient to establish risk of loss. *Lauritzen*, 835 F.2d at 1536.

Bonnetts argues that he had no opportunity to profit from his initiative, judgment or foresight. He asserts that his income was the product of the amount of miles he drove, which, in turn, were limited by federal regulations. Bonnetts further argues he had no significant risk of loss due to his lack of capital investment in his business enterprise.

The Court, however, disagrees, and finds that the evidence on this issue is indicative, but not determinative, of independent contractor status. First, unlike the Arctic company drivers, Bonnetts had the ability to derive and control his profits from driving by minimizing his costs. Company drivers received $0.24–0.28 per mile, with all operating expenses paid by Arctic. Bonnetts, on the other hand, was paid $0.815 per dispatched mile and $0.655 per empty mile driven, and was required to pay for all of his operating expenses. Also, Bonnetts was required to pay $396.47 per week for truck lease and maintenance obligations. Thus, it is clear that Bonnetts' profits were determined by his control over his overhead, such as the truck lease, and operating costs.

---

**3.** While the employee-independent contractor issue in *Silk* was decided under the Social Security Act, the Supreme Court has held that the same analysis applies to actions under FLSA:

> The Fair Labor Standards Act of 1938 . . . is a part of the social legislation of the 1930's of the same general character as the National Labor Relations Act . . . and the Social Security Act . . . Decisions that define coverage of the employer-Employee relationship under the Labor and Social Security acts are persuasive in

the consideration of a similar coverage under the Fair Labor Standards Act.

*Rutherford Food Corp. v. McComb*, 331 U.S. 722, 723, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947).

**4.** In *Lauritzen*, the migrant farm workers were required to supply only their gloves for harvesting crops. The Seventh Circuit found that this small and insignificant capital expenditure/investment in their business enterprise was not sufficient indicia of the existence of independent contractor status. *Lauritzen*, 835 F.2d at 1537.

Second, Bonnetts bore a concomitant risk of loss along with his opportunity for profit. At a minimum, Bonnetts was obligated to pay D & A $1,585.88 per month, or $19,030.56 per year, for truck lease and maintenance costs. Thus, if Bonnetts chose not to accept any routes for the year, he stood to lose at least $19,030.56, irrespective of the opportunity costs. Similarly, Bonnetts also bore the risk of having his operating costs exceed his revenues, which would generate losses. Finally, Bonnetts bore the risk of loss for any damage to the truck.

### The Employer's Right to Control

The Court must now consider whether Arctic had significant control over the manner in which Bonnetts performed his duties under the Contract. *Selker Bros.*, 949 F.2d at 1294; *Brandel*, 736 F.2d at 1119. Significant to this determination is whether Arctic dictated the manner in which Bonnetts was able to use his "initiative, judgement, or foresight" in transporting cargo for Arctic. *McComb*, 331 U.S. at 730, 67 S.Ct. 1473.

Bonnetts argues that, in practice, Arctic exercised significant control over the manner in which he transported cargo, and cites to several instances where Arctic's practice did not comport with the terms of the Contract. According to Bonnetts, Arctic dictated many aspects of his job performance. He was presented with voluminous instructional material during the October Orientation which set forth various company procedures to be followed during shipments. Bonnetts also alleges that Arctic would send him messages, via an on-board computer monitor, which mandated the use of particular routes. And while the Contract permitted Arctic to check the progress of its drivers intermittently during shipments, Bonnetts claims that he was reprimanded at times when he chose a route which was different than that suggested by Arctic. This, says Bonnetts, had the effect of coercing a driver to follow the Arctic suggested routes.

Bonnetts further argues that Arctic controlled the terms of his compensation and hiring of additional personnel. He claims that Arctic controlled the amount of miles he drove, and thus his compensation, by some-

times ordering him to sit at a designated area awaiting a delivery. Bonnetts also alleges that he approached Arctic a few times with respect to leasing a second truck and hiring another driver, but the idea was rejected by Arctic.

Next, Bonnetts argues that he was treated the same as the other drivers who were considered employees of Arctic. He was subject to the same disciplinary procedures as company drivers, such as progressive discipline reports and counseling by supervisory staff. During the December holiday season of 1995, he was forced to accept a delivery, despite the fact that he had previously informed Arctic that he was "off duty." According to his testimony, after declining Arctic's offer for a shipment, Bonnetts was told by the Arctic dispatcher "you're the only truck available, you have to do it."

Arctic denies that it engaged in selecting routes for Bonnetts. Arctic maintains that it simply exercised its rights under the Contract to conduct over-the-road progress calls, informing Bonnetts of any conditions or factors which might have prevented him from transporting cargo in a timely manner. Arctic does not dispute that Bonnetts was given instructional material at the 1994 orientation, but argues that such materials do not rise to the level of control sufficient to warrant a finding of an employer-employee relationship, especially since Bonnetts admits that he was aware that the orientation was being conducted only for contract drivers.

The Court finds that a genuine issue of material fact exists with respect to whether Arctic exercised control over the manner in which Bonnetts performed his duties under the Contract. If Bonnetts' allegations are proven true at trial, then it would appear that, in spite of contractual provisions to the contrary, Arctic controlled a significant portion of Bonnetts' duties under the Contract, and thus engaged in an employer-employee relationship with Bonnetts. Bonnetts would then be left to prove the elements of the FMLA claim. Conversely, if Bonnetts' allegations are not proven, then the totality of the circumstances will warrant a finding that Bonnetts was an independent contractor, and

his FMLA claim would fail as a matter of law.

### Whether the Worker Was an Integral Part of the Employer's Business

In determining whether Bonnetts' services were an integral part of Arctic's business, a court must consider the nature of the work performed by Bonnetts viewed in the context of Arctic's business. Workers are more likely to be considered "employees" where they perform the primary work of the alleged employer. *Selker Bros.*, 949 F.2d at 1295–96.

It cannot be disputed that Bonnetts' services were an integral part of Arctic's business. Arctic is engaged in the business of transporting cargo. Bonnetts was hired by Arctic for the express purpose of transporting cargo. Thus, the Court finds that this factor is indicative of an employer-employee relationship.

This finding, however, is not sufficient to determine the relationship between Bonnetts and Arctic. Reviewing all of the facts in this case under the six (6) factors set forth in *Brandel* the Court finds that the determination of whether Bonnetts is an employee or an independent contractor, for the purposes of the FMLA, cannot be made until the factual issues related to Arctic's right to control and Bonnetts' degree of skill are resolved.

### CONCLUSION

For the reasons set forth above, the Court finds that genuine issues of material fact exist with respect to whether Arctic exerted significant control over the manner in which Bonnetts performed his contractual duties and, consequently, his degree of skill. Plaintiff's Motion for Partial Summary Judgment is **DENIED** and Defendant's Motion for Summary Judgment is **DENIED**.

**IT IS SO ORDERED.**