**Felipe ELIZONDO, Olivia Elizondo, Angel Elizondo, Marlen Elizondo, Nancy Elizondo, Karina Elizondo, Sarai Elizondo, Veronica Nino and Juan Nieto, Plaintiffs,**

v.

**Floyd Joseph PODGORNIAK and Ronald John Podgorniak, individually and d/b/a Podgorniak Farms, Defendants.**

No. 98–10235.

United States District Court,
E.D. Michigan,
Northern Division.

Aug. 30, 1999.

Morley Witus, Barris, Sott, Detroit, MI, Thomas K. Thornburg, Farmworkers Legal Services, Berrien Springs, MI, Bonita P. Tenneriello, Legal Services of Southeastern Michigan, Ann Arbor, MI, for Plaintiffs.

Robert D. Mannor, Shinners & Cook, Saginaw, MI, Defendants.

***OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT***

ROBERTS, District Judge.

### I. *Introduction*

On July 31, 1998, Plaintiffs Felipe Elizondo, Olivia Elizondo, Angel Elizondo, Marlen Elizondo, Nancy Elizondo, Karina Elizondo, Sarai Elizondo, Veronica Nino and Juan Nieto filed their Complaint against Defendants Floyd Podgorniak and his brother Ronald Podgorniak, co-owners of Podgorniak Farms, alleging violations of the Fair Labor Standards Act (FLSA), 29

U.S.C. § 201, *et seq.*, and the Migrant and Seasonal Agricultural Workers Protections Act (MSAWPA), 29 U.S.C. § 1801, *et seq.* Plaintiffs are migrant farm workers from Texas who harvested "pickles"[1] on Defendants' Michigan farm during the 1996 and 1997 seasons.

In accordance with the Scheduling Order, Plaintiffs filed a Motion for Partial Summary Judgment and Defendant filed a Motion for Summary Judgment on June 30, 1999. The threshold issue in each motion is whether Plaintiffs were "employed" by Defendants as defined by FLSA and MSAWPA. Relying upon a Sixth Circuit case, *Donovan v. Brandel*, 736 F.2d 1114 (6th Cir.1984), Defendants attempted to create an independent contractor/sharecropper arrangement with Plaintiffs and other workers. Plaintiffs argue that the *Brandel* court limited its holding to the unique circumstances of that case, that their case is distinguishable, and that ample other authority demonstrates a trend toward finding migrant workers under similar fact patterns to be employees for the purposes of FLSA and MSAWPA. The Court agrees with Plaintiffs and thus will grant their Motion for Partial Summary Judgment with respect to the issue of whether they were Defendants' employees and deny Defendants' Motion for Summary Judgment on this threshold issue. Other, secondary rulings will follow.

### II. *Background*

Defendants grew various crops, including pickles, on 433 acres of land that they owned or leased. (Plt's Exh. 6). After learning of Defendants' operation from a stranger at a Meijer store, Plaintiffs in 1996 became among the many migrant laborers who arrive each year to harvest pickles at Defendants' farm. The harvesting took place near the completion of a process that concluded with the selling of the pickles to Matthews Pickle Farm.

---

1. Although Plaintiffs actually picked cucumbers that would only later be pickled, those cucumbers are commonly referred to as "pickles."

The process began in February of each year, when Floyd met with Dan Matthews of Matthews Pickle Farm. At that meeting, Matthews would set the price he would pay for pickles each year. Floyd had been selling pickles to Matthews for 20 years. Confident that he would not find a better price, Floyd did not shop around. (FPI at 8 & FPII at 56–59).[2]

Next, Defendants decided whether to plant pickles and when to plant. The "very critical" decision of when to plant was made after careful study of weather and soil conditions. After determining that the time was right, Defendants planted the seed and applied herbicide, taking cautions not to make costly mistakes. Plants appear from the ground about five days after the seeds are planted. When the pickles reached the two leaf stage, Defendants began cultivating them. Using a tool on the back of a tractor, Defendants first very slowly cleaned the dirt between the rows of pickles. The second cultivation entailed throwing dirt under the plants to make them stand up and the final cultivation involved fluffing them up. During the cultivation, Defendants assured that the cultivator was not set up improperly; a poor set up could result in pickles being torn out of the ground. The final cultivation took place about three weeks before harvesting began. (FPI at 45–54, 58, & 76–79).

Throughout the cultivation process, no harvest workers were involved. (FPI at 58 & 77). They came into the picture between the final cultivation and when the harvesting began.

First, the harvesters were assigned plots of crop. The testimony on how the plots were assigned is somewhat mixed. Floyd testified that the plots were assigned during a two day period on a first

come, first serve basis. (FPII at 4–7). However, he also testified that he would reserve the same plots for Caesar Martinez each year, who arrived late in the season. (FPI at 115). Five days later, Floyd changed his testimony, indicating that he would not have reserved plots for anybody, including Martinez. He just held a certain number of rows for Martinez, but not in any specified location. (FPII at 7–8). In contrast to Floyd's testimony, Plaintiff Karina Elizondo testified that, although they were the first to arrive to select their plots in 1996, they were the last to receive a plot assignment. She stated that Floyd told them that they would have to wait until the workers with more tenure were assigned their plots. (KE at 14). Likewise, Felipe testified that Floyd assigned Plaintiffs the last rows that were left. (FE at 28 & 58).

After the plots were assigned, the harvesters were required to sign two contracts—a Crop Sales Agreement and a Commercial Haulers' Agreement. The Crop Sales Agreement purported to sell the crop to the harvesters in exchange for 20% of the crop.[3] (Plt's Exh. 1 at 1). By entering into the Commercial Haulers' Agreement, the "Owner" of the crop of pickles, i.e. the harvesters, hired the "Haulers," i.e., Defendants, to haul the pickles to a manufacturer "indicated by the Owner." (Plt's Exh. 1A at 1–2). In exchange for their hauling service, Defendants received another 30% of the amount received from the sale of the pickles. (Plt's Exh. 1A at 1). The net effect of the Crop Sales Agreement and the Commercial Haulers Agreement was that proceeds from the sale of the pickles to Matthews was split fifty-fifty between the harvesters and Defendants.

---

2. Consistently with Plaintiffs' Brief, I will refer to each deposition by the initials of the deponents' names. Floyd's depositions are in two volumes, so his are referred to as "FPI" and "FPII."

3. The language of the Agreement is poorly written. Instead of indicating that the purchase price for the crop was 20% of all proceeds from the sale of plants grown on the plot, the Agreement states that the price is "equal to twenty (20%) percent of all Crop grown on the Plot."

After the contracts were signed by the harvesters, the hoeing began.[4] (FPI at 80–81). Hoeing involves weeding, spacing and, sometimes, lining up the plants. (FPII at 11–12 & 25). Despite the fact that the Crop Sales Agreement ostensibly deemed the harvesters to be owners of the plants, Defendants paid the harvesters by the row to hoe. (FPII at 19 & Admission No. 15). Floyd was unable to explain this inconsistency, offering only that "[i]t's been a practice for years and years, and that's just the way we do business." (FPII at 19). The price per row ran from $4 to $8, depending upon the length of the row. This price was negotiated so as to assure that the workers "got a good wage...." (FPII at 27–28).

Next, the harvesting began. To harvest, the workers would monitor their rows and start picking when the fruit is the right size.[5] The pickles that were the desirable size were picked carefully so as to avoid damaging those that were not ready for picking. Each harvest yielded about eight or nine pickings. (FPII at 29–30). The picked pickles were placed into pails and then boxes owned by Defendants. The boxes were emptied into bags owned by Matthews. (FPII at 46–47).

Floyd described harvesting as a "very skilled trade," yet also testified that he provided no training, that he does not reject migrants who have no experience and that a minor could learn how to pick. If a worker had no experience, Floyd testified that he would introduce them to tenants with experience so that they could explain the process. (FPII at 30–33). Affiants Tammy Brown and Lori Davila concurred that skill is required for proper harvesting. Experience is required to properly care for the vines and yield a good, profitable harvest. (TB Aff. at ¶ 12 & LD Aff. at ¶¶ 13–14).

In contrast to Floyd's testimony, Plaintiff Veronica Nino testified that, when the pickles were ready for picking in 1996, Floyd told Plaintiffs what to do at a meeting that lasted less than an hour. "[W]hen the pickles were already in the size that we could pick them, he went to the camp and told us that pickles are ready, we want them small, and the smaller ones are paid better. That's what he told me." No one ever showed them how to handle the pickles, but "it was easy." For example, they knew when to separate the vines because, otherwise, they would end up stepping on them. Veronica stated, "We weren't that dumb." (VN at 9–11 & 71).

Similarly, Ronald testified that pickle picking required no special background or special education. All that was necessary was to be a hard worker and "to be able to bend over and pick, I guess." (RN at 92–93).

During the harvesting season, Floyd had a day job at Northern Tube as a purchasing manager. He would, however, arrive at the farm at 5:00 p.m. to monitor and haul bags. He monitored for the size of the pickles (the smaller the better) and to see whether the harvest was on schedule. If Floyd observed pickles that were getting too large, he would "suggest" to the harvesters that they might need more help and discuss their plans on getting back on schedule. Even if there was no apparent problem, Floyd would give the harvesters feedback on how they could improve. For example, he would encourage the harvesters to pick a little smaller in dry weather and a little larger in wet weather. (FPII at 39–41). Nonetheless, Defendants did not supervise the harvesters day to day activity. (OE at 48–51, AE at 13, TB Aff. at ¶ 15–18, LD Aff. at ¶ 16–18).

Also in the afternoon, Defendants and/or their employees[6] assisted the harvesters in loading bagged pickles, weighing 65 to

---

4. Sometimes the contracts were signed after hoeing began. (FPI at 81 & FPII at 18).

5. However, according to Veronica, Floyd told Plaintiffs when the pickles were ready for

picking at the beginning of the season in 1996. (VN at 10).

6. In this context, I am distinguishing the harvesters from workers that Defendants admit are employees.

75 pounds a piece, onto a wagon. Defendants' and/or their employees transported the pickles to Matthews' grading station. It was there that the pickles were sorted and the ones that were nubs, too large, or broken were discarded. Floyd was at the grading station all the time, verifying the box counts. He stayed until everything was documented. If Floyd identified a box of poor quality pickles, he might have talked with the harvesting group responsible for the box. (FPII at 42–45). The harvesters were generally not present at the grading station.[7] (FPII at 49).

After all of the counting was done, Matthews would write a check to Defendants, who would in turn write checks to the harvesters based upon the fifty-fifty split formula. No deductions were taken from the harvesters' checks. (FPII at 49–50 & Admission No. 9).

Near the end of the harvesting season, when the quantity of produce would begin to lessen, Floyd would unilaterally increase the percentage of the proceeds he would give the harvesters. Instead of the 50% the harvesters were entitled to under the Agreements, Floyd would pay them anywhere from 60 to 100% of the proceeds from the sale of the crops to Matthews. He explained, "[I]f I start noticing them coming close to where they might not be at minimum wage, I will up the percentage to them." (FPII at 61–62).

According to Floyd, the harvesters arrived at his camp as early as June 1 and at least by June 15 of each year (FPI at 74 & 116). Presumably, they start hoeing shortly thereafter. In 1996, the pickles were not ready for picking until August 21 due to weather conditions. The harvest lasted until September 16 that year. The following year, the harvesting began on July 20 and lasted until mid August. (FPII at 64–65).

Plaintiffs lived at a labor camp owned by Defendants throughout the 1996 and 1997 seasons. According to Veronica, Plaintiffs worked about eight hours per day for Defendants, but would have to stop working some days in order to give the pickles more time to grow. (VN at 20). Olivia Elizondo testified that they began work each day at 8:00 a.m. and ended at 2 or 3 p.m. (OE at 32). Brown and Davila, in contrast, both stated in their affidavits that Plaintiffs worked few hours on Defendants' farm. (TB Aff. at 9–11 & LD Aff. at 12). Notwithstanding this allegation, Floyd testified that Plaintiffs were "very skilled" at handling the plants and that they accomplished a "good average yield" in both 1996 and 1997. (FPII at 67).

In 1996, Plaintiffs arrived at Defendants' camp three to four weeks before the harvesting season began. (VN at 6–7). Since Floyd did not yet have any work for Plaintiffs, he referred them to another farmer during that period of time. (VN at 22–23). Additionally, after the harvesting began in the 1996 and 1997 seasons, Plaintiffs would sometimes work for other farmers on afternoons in which they were through picking their rows at Defendants' farm early in the day. (KE at 36 & FE at 47).

During the 1996 and 1997 seasons, the Michigan Department of Public Health, Bureau of Environmental and Occupational Health cited Defendants for numerous health violations at their labor camps, including overcrowding, electrical and garbage problems. (Plt's Exhs. 7 & 8).[8] Plaintiffs claim that, as a result, several Plaintiffs and their children developed Shigellosis, a disease that is spread through human waste, in July 1997. At the end of that season, Plaintiffs sought legal counsel and this lawsuit followed.

## III. *Analysis*

### A. *Summary Judgment Standard*

Under Fed.R.Civ.P 56(c), summary judgment may be granted "if the plead-

---

**7.** Veronica Nino testified that her family would go to the grading stations once a week or less to write their group number on their boxes. (VN at 88–89).

**8.** These violations will be discussed at length, *infra.*

ings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Copeland v. Machulis,* 57 F.3d 476, 478 (6th Cir.1995). A fact is "material" and precludes a grant of summary judgment if "proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir.1984). The court must view the evidence in the light most favorable to the nonmoving party and it must also draw all reasonable inferences in the nonmoving party's favor. *Cox v. Kentucky Dept. of Transp.,* 53 F.3d 146, 150 (6th Cir.1995).

The moving party bears the initial burden of showing that there is no genuine issue of material fact. *Snyder v. Ag Trucking, Inc.,* 57 F.3d 484, 488 (6th Cir. 1995). To meet this burden, the movant may rely on any of the evidentiary sources listed in Rule 56(c). *Cox,* 53 F.3d at 149. Alternatively, the movant may meet this burden by pointing out to the court that the nonmoving party, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case, and on which that party will bear the burden of proof at trial. *Tolton v. American Biodyne, Inc.,* 48 F.3d 937 (6th Cir.1995); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472 (6th Cir.1989). Thus, a motion for summary judgment is a means by which to challenge the opposing party to "put up or shut up." *Cox,* 53 F.3d at 149; *Street,* 886 F.2d at 1478. The moving party does not, however, have to support its motion for summary judgment with evidence negating its opponent's claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1985).

Once the moving party has met its burden, the burden shifts to the nonmoving party to produce evidence of a genuine issue of material fact. Rule 56(e); *Cox,* 53 F.3d at 150. The nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of its complaint. *Copeland,* 57 F.3d at 479. The mere existence of a scintilla of evidence to support the nonmoving party position will be insufficient; there must be evidence on which a jury could reasonably find for the nonmoving party. *Snyder,* 57 F.3d at 488; *Tolton,* 48 F.3d at 941.

### B. *Plaintiffs were "Employees" under FLSA and MSAWPA*

In 1938, FLSA was enacted to ameliorate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers...." 29 U.S.C. § 202(a). Among other things, FLSA provisions establish a minimum wage and maximum hours for "employees." Sections 206 and 207. Similarly, the disclosure and record keeping responsibilities imposed on agricultural employers under the MSAWPA pertain only to employees. 29 U.S.C. §§ 1803 & 1821. Accordingly, the principle issue in the Motions before the Court is whether Plaintiffs were employees of Defendants', as defined by FLSA and MSAWPA, during the 1996 and 1997 harvesting seasons.

Under the FLSA, an " 'employee' means any individual employed by an employer," and " '[e]mploy' includes to suffer or permit to work." Section 203(e)(1) & (g). The definition of employ is decidedly broad.

This definition was described by then-Senator Hugo Black as 'the broadest definition that has ever been included in any one act.' *See United States v. Rosenwasser,* 323 U.S. 360, 363 n. 3, 65 S.Ct. 295, 89 L.Ed. 301 (1945). The FLSA's definition is broader than the common-law definitions used by other statutory schemes. *See Nationwide*

*Mut. Ins. Co. v. Darden,* 503 U.S. 318, 326, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992) (noting that FLSA has broader coverage than ERISA, which relies on traditional agency-law principles to determine employee status); *accord Dole v. Elliott Travel & Tours, Inc.,* 942 F.2d 962, 965 (6th Cir.1991) (same) (*citing Goldberg v. Whitaker House Coop.,* 366 U.S. 28, 33, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961)).

*Imars v. Contractors Manufacturing Services, Inc.,* 165 F.3d 27, 1998 WL 598778, *2 (6th Cir.1998) (unpublished).

Under MSAWPA, the broad definition of "employ" set forth under the FLSA is expressly adopted. Section 1802(5).

■ The issue of Plaintiffs' employment status with Defendants is a question of law and depends on the factual circumstances at issue. *Donovan v. Brandel,* 736 F.2d 1114, 1116 (6th Cir.1984). In *Brandel,* the Court held that the pickle harvesters at issue in that case were independent contractors of the defendant. Defendants rely heavily on the *Brandel* opinion. However, the *Brandel* court appears to have discouraged such a blanket reliance on its holding. The court emphasized that each case must be examined individually.

> Another panel of this Court has emphasized that in examining a particular factual setting the total relationship must be examined, rather than isolated factors. *Dunlop v. Dr. Pepper–Pepsi Bottling Co.,* 529 F.2d 298 (6th Cir.1976). The issue of the employment relationship does not lend itself to a precise test, but is to be determined on a case-by-case basis upon the circumstances of the whole business activity. *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947).

*Id.* The court further called its factual record "unique," and "strikingly different" from *Donovan v. Gillmor,* 535 F.Supp. 154 (N.D.Ohio 1982), *appeal dismissed* 708 F.2d 723 (6th Cir.1982), which held migrant pickle workers to be employees.

*Brandel,* 736 F.2d at 1120 & n. 11. In other words, *Brandel* did not call *Gillmor* wrong, just different.

In *Cavazos v. Foster,* 822 F.Supp. 438, 441–442 (W.D.Mich.1993), which found migrant pickle workers to be employees, the court noted numerous other decisions after *Brandel,* both within and outside of the Sixth Circuit, in which migrant workers were found to be employees.

After *Brandel* was decided, several district courts within the Sixth Circuit have held that migrant workers are employees. See *Colunga v. Young,* 722 F.Supp. 1479, 1485 (W.D.Mich.1989) (Hillman, J.), *aff'd,* 914 F.2d 255 (6th Cir.1990) (migrant tree trimmers are employees under FLSA, FICA, and AWPA for purposes of minimum wage, social security, and unfair labor practice claims); *Mendez v. Brady,* 618 F.Supp. 579, 582 (W.D.Mich.1985) (Hillman, J.) (migrant blueberry pickers are employees under FLSA); *Caballero v. Resmer,* No. 88–CV–10231, slip op. at 5–7 (E.D.Mich., March 6, 1991) (migrant pickle workers are employees and not independent contractors for purposes of minimum wage and social security payments); *Salinas v. Birkhold,* No. C87–7531, slip op. at 17 (N.D.Ohio, Oct. 6, 1988) (migrant pickle workers are employees under AWPA). Courts in other jurisdictions have likewise ruled that migrant workers are employees. See *Brock v. Lauritzen,* 624 F.Supp. 966 (E.D.Wis.1985); *aff'd, Secretary of Labor, U.S. Dept. of Labor v. Lauritzen,* 835 F.2d 1529, 1538 (7th Cir. 1987), *cert. denied,* 488 U.S. 898, 109 S.Ct. 243, 102 L.Ed.2d 232, *reh'g denied,* 488 U.S. 987, 109 S.Ct. 544, 102 L.Ed.2d 574 (1988) (pickle farmworkers are employees under FLSA); *Castillo v. Givens,* 704 F.2d 181 (5th Cir.1983), *cert. denied,* 464 U.S. 850, 104 S.Ct. 160, 78 L.Ed.2d 147 (1983) (cottonfield workers are employees of the agribusiness entity under FLSA); *Real v. Driscoll Strawberry Associates, Inc.,* 603 F.2d 748 (9th Cir.1979) (strawberry workers are em-

ployees and not independent contractors under FLSA); *Aviles v. Kunkle,* 765 F.Supp. 358, 364 (S.D.Tex.1991) (pickle harvesters were employees within meaning of AWPA and FLSA and not independent contractors), *vacated for lack of personal jurisdiction,* 978 F.2d 201 (5th Cir.1992); *Yeska v. State, Labor and Industry Review Comm'n,* 149 Wis.2d 363, 440 N.W.2d 823 (App.1989) (pickle harvesters not independent contractors but covered employees under state unemployment law); *S.G. Borello & Sons, Inc. v. Department of Indus. Relations,* 48 Cal.3d 341, 769 P.2d 399, 256 Cal. Rptr. 543 (1989) (en banc) (pickle harvesters not independent contractors but employees covered by state worker's compensation law); *In re Wage and Hour Violation of Kokesch and Maresch,* 411 N.W.2d 559 (Minn.App.1987) (pickle harvesters not independent contractors, but employees covered by Minnesota minimum wage law).

■■■■ Thus, this Court can and should review other decisions, in addition to *Brandel,* to determine whether, under the totality of circumstances presented here, Plaintiffs were employees of Defendants. Accordingly, a comparison of the instant case to *Brandel, Gillmor, Secretary of Labor v. Lauritzen,* and *Cavazos* will follow. This comparison will trace the six factors the Court must consider to determine Plaintiffs' employment status: 1) the permanency of the relationship between the parties; 2) the degree of skill required for the rendering of the services; 3) the worker's investment in equipment or materials for the task; 4) the worker's opportunity for profit or loss, depending upon his skill; 5) the degree of the alleged employer's right to control the manner in which the work is performed; and 6) whether the service rendered is an integral part of the alleged employer's business. *Brandel,* 736

F.2d at 1117 & n. 5. An analysis of these factors leads to the conclusion that they weigh overwhelmingly in Plaintiffs' favor.

### 1. *Permanency of relationship*

In *Brandel,* the court found that the harvesters had only a temporary relationship with the defendant. Some workers did not remain during the entire harvest season and about 40 to 50% of the harvesters returned to the defendant's farm annually. Several of the migrant workers testified that they held full time jobs elsewhere and considered the income from jobs with the defendant to be supplemental.[9] *Brandel,* 736 F.2d at 1117.

Recognizing that pickle harvesting is inherently seasonal, the *Gillmor* court found the relationship of the parties before it to have sufficient indicia of permanency due to the exclusive, season long relationship between the migrants and the defendants. *Gillmor,* 535 F.Supp. at 162–163. The court in *Secretary of Labor v. Lauritzen,* 835 F.2d 1529, 1537 (7th Cir.1987), agreed with *Gillmor* that an exclusive, season long relationship was sufficient, and added that the not uncommon annual return of migrant workers was another indication of permanency.

*Cavazos* contrasted the 40 to 50% rate of return of the workers in *Brandel* with its 70% annual return. The *Cavazos* court also contrasted the 120 day season in which the plaintiffs worked to the 30 to 40 days harvesters worked in *Brandel.* Following *Gillmor,* the *Cavazos* court cited the exclusive relationship the plaintiffs had with the defendants during that 120 day season as significant. *Cavazos,* 822 F.Supp. at 443–444.

The instant case appears to fall in between the above cited precedent. Unlike *Gillmor, Lauritzen* and *Cavazos,* Plaintiffs

9. One of the "unique" circumstances of *Brandel* was the procedural history of the case. The Secretary of Labor filed the lawsuit against a Michigan farmer alleging that he had violated the child labor and recordkeep-

ing provisions of the FLSA. Nine of the migrant workers at issue intervened as defendants, concurring that they were independent contractors of the defendant.

did not have an exclusive relationship with Defendants during the harvesting season.

On the other hand, unlike *Brandel,* none of the Plaintiffs had full time jobs elsewhere or appeared to treat their work at Defendants' farm as supplemental. To the contrary, Plaintiffs testimony suggests that the work at the other farms was supplemental. Plaintiffs only worked for other farmers when there was no work to do at Defendants' farm. And, although the Brown and Davila affidavits represent that Plaintiffs rarely worked, Floyd testified that Plaintiffs picked a good average yield. Further, the Plaintiffs herein remained at the farm the entire season, unlike the farmers in *Brandel* that did not stay for the entire season.

Working anywhere from June 1 until mid August of each year, the season at issue lasted for about 60 to 75 days. This time period falls in between the 30 to 40 day season in *Brandel* and the 120 day season in *Cavazos,* but is closer to *Brandel.* Neither Plaintiffs nor Defendants provided the Court with the percentage of workers who return annually. However, Floyd hinted that the percentage of annual return is high: "The people I work with have been with me for years." (FPII at 120). Evidence of a high rate of return has been considered relevant. "One indication of permanency in this case is the fact that it is not uncommon for the migrant families to return year after year." *Lauritzen,* 835 F.2d at 1537.

This case mirrors neither *Brandel,* which found a lack of permanency, nor any of the cited cases in which sufficient indicia of permanency was found. Accordingly, the factor of permanency does not weigh heavily in favor of either party.

### 2. The degree of skill required

The *Brandel* court stands alone in finding the skill required for pickle harvesting to weigh in favor of finding an independent contractor relationship. The court found that experienced harvesters were skilled at rowing and blocking the vines. Additionally, when picking, skill was required to distinguish between seven different grades of sizes and to determine ripeness. *Brandel,* 736 F.2d at 1118. The migrants had entered into a contract whereby they would receive 50% of the proceeds from the sale of the pickle crop. *Brandel,* 736 F.2d at 1116. As a result of that contract, experienced migrants will yield higher profits. Additionally, the migrants were charged with monitoring their crops to determine the need for irrigation and insecticide, as they assumed the responsibility for the day-to-day operation of their crops. "The proofs were uncontroverted in establishing that the judgment necessary to productively manage the harvesting of the pickles will not develop without at least one season's experience." *Brandel,* 736 F.2d at 1118.

In stark contrast, the *Gillmor* court discounted the skill necessary for pickle farming in summary fashion. The court called the farm work performed by migrant workers "unskilled labor," stating:

> There can be no argument to the contrary on this issue. No special training or experience is necessary to perform the task of picking pickles. The fact that this migrant labor is unskilled is borne out by the allegations that children under the age of 12 were in the fields working.

*Gillmor,* 535 F.Supp. at 162.

The *Lauritzen* court recognized that some specialized skills are necessary to recognize which pickles to pick, but concluded that those skills did not set the pickle harvesters apart from any good employee in any line of work. "Skills are not the monopoly of independent contractors." *Lauritzen,* 835 F.2d at 1537.

The record in *Cavazos* indicated that there was no educational requirement for pickle harvesting, the fundamentals of which could be learned in half a day. This record contrasted with that in *Brandel,* in which there was uncontroverted evidence that at least one season's experience was necessary to productively manage the har-

vesting of the pickles. *Cavazos*, 822 F.Supp. at 443.

In this case, the Court finds that the factor regarding the harvesters' skills weighs in Plaintiffs' favor. Plaintiffs testified that they arrived at Defendants' farm in 1996 without any pickle picking experience. (KE at 32 & FE at 37) Yet, they learned how to pick the pickles in a meeting with Floyd that lasted less than an hour. Despite their lack of previous experience, Plaintiffs' picked a good average yield even in their first year. Thus, this record is in contrast to that in *Brandel*, where the uncontroverted evidence was that the harvesters needed at least one year of experience before they could perform productively.

Additionally, Floyd testified that he did not turn away migrants with no experience, yet he also did not train them. Ronald indicated that the only skills necessary to pick pickles was the ability to work hard, bend over and pick.

Moreover, Floyd monitored the fields for pickle sizes, weather conditions and to see whether the harvesting was on schedule. He would advise the harvesters on how to improve their services, even if there were no problems identified. With Floyd's monitoring and guidance, the skill level necessary for the harvesters in this case appears lower than that in *Brandel*, where the harvesters independently monitored their own fields.

The Court, therefore, finds that the instant record reveals that the degree of skill required for pickle harvesting was minimal and supports a finding that Plaintiffs were employees.

### 3. The workers' capital investment

In *Brandel*, the harvesters' capital investment in their work consisted of pails and gloves. The defendant, in contrast, had substantial capital investment in his pickle farming operations, i.e., tractors, irrigation equipment and trucks. The *Brandel* court, nonetheless, found this factor to be not determinative because of the defendant's limited capital investment in the equipment and materials required for the task of harvesting pickles. *Brandel*, 736 F.2d at 1118.

Instead of limiting the investment analysis to the harvesting phase of the pickle farming operation, the *Gillmor* court focused on the entire process.

> The only capital investments provided by the migrants are their hoes. Everything else, from farm equipment, land, seed, fertilizer, insecticide to the living quarters of the migrants is supplied by the defendants. There can be no argument whatsoever that the migrants have any investment in defendants' farm operation other than their own time and labor.

*Gillmor*, 535 F.Supp. at 161–162.

In *Lauritzen*, the court quoted with approval the analysis of *Gillmor* and rejected the narrow focus of *Brandel* on the harvesting phase of the farm operation. "[W]e believe that the migrant workers' disproportionately small stake in the pickle-farming operation is an indication that their work is not independent of the defendants." *Lauritzen*, 835 F.2d at 1537.

Although finding that an analysis of the total investment in the pickle crop is more appropriate, the *Cavazos* court found that the defendant's capital investment far exceeded that of the plaintiffs even if it limited consideration to the harvesting process only. *Cavazos*, 822 F.Supp. at 443.

This Court agrees with *Gillmor*, *Lauritzen* and *Cavazos* that the more appropriate approach for comparing the parties' capital investment is to consider the entire pickle farming operation from the time that planting began until the pickles were sold to Matthews. The harvesting is inextricably intertwined with the other components of the pickle farming process, and could not occur without the pre-existing investment necessary for the planting and cultivation of the plants.

In this case, the Plaintiffs' investment was limited to $5 hoes. (FPII at 97). By contrast, Defendants paid over $73,000 in expenses for hand harvested pickles during the 1996 and 1997 seasons, and had close to $59,000 worth of tractors, tillage tools, planters, cultivators, trailers, buckets and bags for use on their farm during that period. (Dft's Ans. to Second Interrogatories at Nos. 6 & Admission No. 22).

Moreover, even if the Court focuses solely on the harvesting phase of the pickle farming, Defendants' investment still far outweighs that of Plaintiffs. For the harvesting, Defendants supplied bags valued at about $380 and buckets valued at about $200. (Admission No. 22). Additionally, Defendants' tractors were used during the harvesting. (FPII at 34–36).

Therefore, the Court finds that the capital investment factor weighs in favor of Plaintiffs being considered employees.

### 4. The workers' opportunity for profit or loss, depending upon their skill

Although finding that the harvest workers were not exposed to any risk of loss, the *Brandel* court agreed with the trial court that, as a result of their fifty-fifty contract, "the migrant workers have an opportunity for profit in that their compensation would be greater if they succeeded in maximizing the production of smaller pickles." *Brandel*, 736 F.2d at 1119.

In contrast to *Brandel*, the plaintiffs in *Gillmor* were paid according to the number of pickles they picked, which is called "piecework." *Gillmor*, 535 F.Supp. at 162.

In *Rutherford Food Corp. v. McComb*, [331 U.S. 722, 730, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947) ], the Supreme Court found that '(w)hile profits ... depended upon the efficiency of their work, it was more like piecework than an enterprise that actually depended for success upon the initiative, judgment or foresight of the typical independent contractor.'

In this instance the migrants are engaged in piecework for defendants. They are paid according to the actual amount of pickles picked. In their employment role, the migrants do not have the opportunity to exercise 'the initiative, judgment or foresight of the typical independent contractor'. They have no input regarding the quantity or price of the pickles, nor do they have a choice as to who to sell the pickles to. The cultivation of the crop is controlled entirely by defendants. The migrants exercise no entrepreneurial discretion whatsoever. Other than working faster or longer hours, the migrants cannot increase their 'profits'. Upon closer examination, this profit is nothing more than wages paid for the total number of pickles picked. The Court will not allow form to triumph over substance. The 'profits' of the migrants must be seen for what they really are: wages paid for pickles picked.

*Gillmor*, 535 F.Supp. at 162.

Although the Plaintiffs here could increase their wages by picking the right size of pickles, they did not have the opportunity to earn "profit" as described by the *Brandel* court, making a holding which comports with *Gillmor* justified in this case. Plaintiffs did not have the entrepreneurial discretion to negotiate the price paid for the pickles, nor the choice of whom to sell the pickles.[10] Additionally,

---

10. Defendants note that, in *Brandel*, the court found that the price for the pickles was set unilaterally by the processor in advance of the harvesting season and that the farm owner had no more control than the harvesters. *Brandel*, 736 F.2d at 1116. Defendants argue that the same is true in this case. However, the district court opinion in *Brandel* emphasized that the harvesters had some say over the prices, as evidence revealed that the farm owner had previously changed processors to secure a higher price at the suggestion of the harvesters. *Marshall v. Brandel*, No. G76–393, slip op. at 7–8 (W.D.Mich. January 17, 1983).

As will be discussed *infra,* the evidence demonstrates that the harvesters in this case had no input into the price of the pickles or to whom the pickles were sold.

neither Plaintiffs nor the other migrant workers played any role in determining which pickles would be accepted and how they were classified at the grading station. Furthermore, as in *Gillmor*, the cultivation of the crop was performed and controlled entirely by Defendants. Slightly modifying *Gillmor*, "The 'profits' of the migrant workers must be seen for what they really are: wages paid for [the right size] pickles picked." *Gillmor*, 535 F.Supp. at 162.

*Cavazos* also supports a finding that the Plaintiffs did not have an opportunity for "profits." More similarly to this case, the plaintiffs in *Cavazos* had entered into an "independent contractor" agreement with the defendant in which they were to be paid variable amounts based upon the size of the pickles. The *Cavazos* court's analysis is apropos to this case.

> The payment system which pays more for correct-sized pickles is, however, nothing more than a sophisticated piecework payment system. It provides a mechanism for the grower to control the timing and quality of the harvest through the harvesters' pocketbooks rather than by direct supervision. It does not afford plaintiffs an opportunity for profits but merely provides a system by which harvesters can earn higher wages by following correct harvesting practices.

*Cavazos*, 822 F.Supp. at 443.

Although, like *Brandel*, there was a fifty-fifty arrangement between the harvesters and Defendants in this case, a holding that Plaintiffs had an opportunity for profit is not compelled by *Brandel*. That court made clear that its holding that the migrants had an opportunity for profits was tied to its finding that the harvesting of pickles was skilled labor.

> The Court is mindful of the determination by the Supreme Court in *Rutherford Food Corp. v. McComb, supra*, that there may be a fine line between pieceworking and skilled labor: 'While profits to the boners depended upon the efficiency of their work, it was more like

piecework than an enterprise that actually depended for success upon the initiative, judgment or foresight of the typical independent contractor'. 331 U.S. at 730, 67 S.Ct. at 1476. In this regard, the Court notes that the unique record before it presents competent evidence that such skills exist and provide the justification for the relationship at issue.

*Brandel*, 736 F.2d at 1118, n. 7.

Since, the record here does not demonstrate that the pickle harvesting on Defendants' farm involved skilled labor, the Court holds that Plaintiffs performed piece work and did not have a genuine opportunity for "profits" in the same manner as an independent contractor; their only opportunity was for higher wages.

### 5. Defendants' right to control

The court in *Brandel* found that the sharecropping arrangement was designed to allow the farm owner to relinquish control of the harvesting arrangement to the migrant workers. Other evidence of a lack of the farm owner's control was the fact that the parties negotiated which piece of land would be assigned to the migrants and that the defendant would plant pickles at a time of year to accommodate a family's summer schedule. *Brandel*, 736 F.2d at 1119. According to the district court opinion in *Brandel*, some migrants also instructed the defendant on the type of pickle to plant, and made recommendations regarding fertilizer, pesticide and irrigation. *Marshall v. Brandel*, No. 76–393, slip op. at 7 (W.D.Michigan, January 17, 1983). The defendant did not appear in the fields to supervise the day-to-day harvesting of the migrants and did not dictate the hours or methods of their work. *Brandel*, 736 F.2d at 1119.

The *Brandel* court rejected the Secretary's effort to focus on the defendant's right to control over the entire farming operation. Additionally, the migrant workers "testified that they considered themselves independent contractors and

would not work for Brandel under conditions whereby he supervised them." *Id.*

In contrast, *Gillmor* did focus on the right to control the entire pickle farming process. "All meaningful aspects of this business relationship: price, crop cultivation, fertilization and insect prevention, payment, right to deal with buyers, and work assignments on other crops, are controlled by defendants." *Gillmor*, 535 F.Supp. at 161.

In *Lauritzen*, the court distinguished its case from *Brandel* by noting that the defendant "occasionally visited the families in the field." *Lauritzen*, 835 F.2d at 1536. Additionally, the court rejected *Brandel's* focus on only the right of the defendant to control the details of the harvesting. "The defendants exercise pervasive control over the operation as a whole." *Id.*

Here, the evidence suggests that Defendants retained significant control over the Plaintiffs' work. Focusing on the harvesting phase of the operation, Plaintiffs claim that Defendants assigned plots to migrant workers based upon a preference for long time employees rather than the first come, first serve basis that Defendants claim. There is evidence to support Plaintiffs' argument. Floyd testified that he would reserve a plot for Martinez and Defendants did not dispute Plaintiffs' claim that they were required to wait to pick their plot until the migrants with more tenure had picked theirs.

Additionally, Floyd testified about advising the migrants as to the size of pickle to pick and about monitoring the fields each day to determine whether the workers were on schedule. He would also advise migrants how to pick depending upon the weather conditions.

Moreover, unlike the migrants in *Brandel*, who would dictate the time in which the pickles should be planted and the type of pickle to plant, the decision on when and what to plant was within the complete discretion of these Defendants. Further-

more, unlike in *Brandel*, the Defendants here were solely responsible for irrigation, insecticide and fertilization. (Admission No. 13).

Additional indicia of control by Defendants is found during the grading process. There is no indication in *Brandel* that the proceeds from the sale of the pickles were tied to Defendants' hauling service, as alleged by Defendants in this case. Thus, the analysis in this case of Defendants' control during the hauling process is appropriate.

The clear evidence in this case is that Defendants required the pickles to be hauled to Matthews[11] and that they controlled all of the negotiations over pricing and quantity with Matthews. Furthermore, Defendants retained the exclusive right to review the grading station tickets and to receive payments from Matthews.

The Court agrees with *Gillmor* and *Lauritzen* that the right of control is more appropriately analyzed by viewing the entire picking farming process. Nonetheless, even when focusing only upon the portion of the process in which Plaintiffs had involvement, it is clear that Defendants exercised significant control despite the lack of day to day supervision over Plaintiffs' work. The arrangement between Plaintiffs and Defendants "provide[d] a mechanism for the grower to control the timing and quality of the harvest through the harvesters' pocketbooks rather than direct supervision." *Cavazos*, 822 F.Supp. at 443.

### 6. *Integral part of the business.*

Suffice it to say that even *Brandel* found harvesting to be an integral part of a farming operation. *Brandel*, 736 F.2d at 1120. Defendants do not dispute that this finding is applicable to this case.

### 7. *Other indicia of employment status*

Other facts presented by this case distinguish it from *Brandel* and support a finding that Plaintiffs were Defendants'

---

11. This evidence will be discussed, *infra.*

employees. First, before harvesting began but after the Crop Sales Agreement was signed, Defendants paid Plaintiffs to hoe the crop the Plaintiffs ostensibly owned for a set fee per row. Floyd justified this practice by stating that it was Defendants' historical business practice. More notably, he testified the per row fees were paid in order to give the workers a good wage. Such testimony is inconsistent with Plaintiffs as independent contractors. Also more consistent with an employment setting is Floyd's yearly custom of increasing the migrants' percentage of proceeds to assure that they receive minimum wage.

Plaintiffs' argument that the practice of migrant workers harvesting crops allegedly "owned" by other sharecroppers is also persuasive. To receive payment, a group needed only to mark the picked pickles with their ticket number. (FPII at 46). Thus, the workers were being paid for the pickles they picked, not because those pickles came from their own crop. This arrangement is more indicative of piecework than sharecropping.

Other evidence offered by Plaintiffs is that the Defendants provided free housing to Plaintiffs and posted employment rights information in the labor camps. (Admission No. 30). Fearing sanctions, Defendants required Plaintiffs to fill out Employment Eligibility Verification forms, in which Plaintiffs were clearly identified as employees and Defendants as employers. (Plt's Exh. 5 & FPII at 78–79). Finally, Floyd signed a Michigan Department of Social Services Agricultural Worker Income Verification Form on July 2, 1997, indicating that Felipe was an employee. In response to the form's question of how the worker is paid—piece rate, hourly or other—Floyd checked "piece rate." (Plt's Exh. 10).

## 8. *The contracts at issue were shams.*

A final consideration supporting Plaintiffs' argument that they were employees, rather than independent contractors of Defendants, is the unequal bargaining power between the parties as exhibited by the Crop Sales and Commercial Hauling Agreements. The evidence establishes that the Agreements that Felipe was required to sign for his family to work on Defendants' farm were phony.

Several provisions of the Agreements at issue had no basis in reality. For example, the Crop Sales Agreement represented:

> Purchaser possess [sic] the special skills and equipment necessary to cultivate Crop and wishes to purchase said Crop on a per acre basis in order to cultivate and eventually sell said Crop at market, distributorship, or to another purchase outlet. . . .

(Plt's Exh. 1 at 1). It continued, "Any and all equipment necessary and appropriate to cultivate Crop shall be furnished by Purchased" and "[a]ll work necessary to prepare, cultivate and deliver Crop shall be performed or furnished by Purchaser, at Purchaser's own expense." (Plt's Exh. 1 at 3). In actuality, Plaintiffs had no special skills nor equipment necessary for cultivating the crop. Indeed, the crop was fully cultivated by the time that the agreement was signed and Plaintiffs' only equipment was $5 hoes.[12]

The Crop Sales Agreement also represented that Plaintiffs would be responsible for applying pesticide. "A written spray schedule will be maintained by Purchaser showing dates of application, the name of any chemical applied to Crop, the quantity or rate of application and the area or number of acres sprayed." (Plt's Exh. 1 at 2). However, the harvesters do not main-

---

**12.** Defense counsel disingenuously argued at oral argument on August 19, 1999 that cultivation of the pickles was an ongoing process that the harvesters performed during the harvesting phase. There is no evidence in the record to support this argument. In fact, Floyd testified that there were three phases of cultivation, and that the third and final phase occurred some three weeks before harvesting began.

tain such a schedule and no pesticides are even applied to pickles. (FPII at 95–96).

Additionally, although the Agreement purported to sell the crop to the harvester, Defendants retained significant rights to control the crop.

> Crop shall not be sold, assigned or in any manner transferred or encumbered by Purchaser, nor shall the Plot or any part of such Plot be subleased, without the prior, express and written consent of the Sellers.

(Plt's Exh. 1 at 4).

The Commercial Haulers' Agreement was also a ruse. The Agreement states that the "Hauler," i.e., Defendants, shall deliver produce to the address indicated by the Owner, i.e., the harvester. (Plt's Exh. 1A at 2). By representing that the crop would be hauled to the destination of the harvester's choice, the Haulers' Agreement contradicts the provision of the Crop Sales Agreement forbidding the harvesters from selling the crop without Defendants' consent. Moreover, when Felipe signed the Haulers' Agreement, Defendants had already selected the destination to which the pickles would be hauled: Matthews. Defendants entered into a contract with Matthews each year to provide a certain amount of bushels of pickles each year and Defendants never fell short. (FPI at 8). Floyd's testimony made clear that the pickles picked on his farm were always shipped to Matthews.

> Q: Matthews is where the Pickles go from the field?
>
> A: Yes.

(FPII at 37).

These bogus Agreements were signed by Felipe in 1996. Both contracts were written in English and Felipe, who spoke no English, was not given a verbatim

Spanish translation.[13] (Admission No. 36). Thus, the statements on each of the Agreements that they were "examined by both parties and [ ] found satisfactory to both" were untrue. (Plt's Exh. 1 at 5 & Exh. 1A at 3).

Defendants dismiss the significance of the written agreements, stating, "[t]he contracts are merely a useful tool in providing the harvesters with a written record of the arrangement." (Dft's Opp. at 13 & 14). Contrary to Defendants' argument, the Agreements were not a "written record of the arrangement." As shown above, they misrepresented the actual arrangement between Defendants and Plaintiffs. Defendants' motivation for requiring Felipe to sign the Agreements may have been to absolve themselves of normal duties associated with being an employer, not to give him a record of the terms of his agreement with Defendants. However, "[t]he Court will not allow form to triumph over substance." *Gillmor*, 535 F.Supp. at 162. The Crop Sales and Commercial Haulers' Agreements will not be allowed to consign Plaintiffs to independent contractor status.

In view of the totality of circumstances presented, including the *Brandel* factors, the additional indicia of an employment relationship, and the fact that the Crop Sales and Haulers' Agreements were mere ruses, the Court finds that Plaintiffs were employees within the meaning of FLSA and MSAWPA.

### C. *The Court Grants In Part and Denies In Part Plaintiffs' Request for Summary Judgment on the Issue of Whether Defendants Violated FLSA and Denies Defendants' Motion for Summary Judgment Regarding FLSA.*

Plaintiffs moved for summary judgment of their FLSA claim, citing two provisions

---

**13.** According to Floyd, Davila and Brown, who were camp health aids, spoke fluent Spanish and explained what the contracts were about to Felipe. Nonetheless, he also testified that neither Davila nor Brown specialized in English to Spanish translation and neither provided a literal translation to Fel-

ipe. (FPII at 88–89). Furthermore, neither Davila nor Brown corroborated Floyd's testimony that they explained the Agreements to Felipe. Since Floyd does not speak Spanish, he has no idea what Davila or Brown told Felipe.

of that Act: the record keeping provision of 29 U.S.C. § 211(c) and the minimum wage provision of 29 U.S.C. § 206(a). The Court will grant summary judgment on Plaintiffs' record keeping claim but deny summary judgment on Plaintiffs' minimum wage claim. Additionally, the Court will deny Defendants' Motion for Summary Judgment to the extent that it challenges Plaintiffs' FLSA claims.

### 1. Record keeping

■ Having found that Plaintiffs were employees subject to the protections of FLSA, the Court likewise finds that there is no genuine issue of dispute that Defendants violated § 211(c) of that Act, which requires:

> Every employer subject to any provision of this chapter or of any order issued under this chapter shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records for such periods of time, and shall make such reports therefrom to the Administrator as he shall prescribe by regulation or order as necessary or appropriate for the enforcement of the provisions of this chapter or the regulations or orders thereunder.

It is undisputed that Defendants did not make, keep or preserve records of the hours that Plaintiffs worked. (Admission No. 31, FPI at 89 & FPII at 75).

Defendants would not admit that the Plaintiffs worked on their farm during the 1996 and 1997 seasons. (Admission No. 2). However, Plaintiffs attach Employment Eligibility Verification forms Defendants maintained for Felipe, Olivia, Karina, Nancy and Veronica that covered both 1996 and 1997 and receipts for pickles picked by the Elizondo family prepared in 1996 and 1997 (Plts' Exhs. 2–5). Angel and Sarai testified that they worked both in 1996 and 1997 (AE at 6 & SE at 11 & 16), while Juan Nieto testified that he worked in 1997. (JN at 6–7).

In opposition to Plaintiffs' Motion, Defendants offer no evidence to dispute that each of the Plaintiffs worked at their farm during the time periods Plaintiffs claim. Thus, there is no genuine issue of material fact that Defendants violated the record keeping requirements of § 211(c).

### 2. Minimum wage

■ The record is less clear regarding Plaintiffs' request for summary judgment of their claim that they were improperly compensated pursuant to § 206(a), which mandates that "[e]very employer shall pay to each of his employees" not less than the minimum wage. An "employee" is defined as "any individual employed by an employer," 29 U.S.C. § 203(e)(1). Thus, FLSA appears to require Defendants to pay each individual employee, which Defendants did not do. Instead, Defendants paid only Felipe. (See Plts' Exh. 10). However, Plaintiffs cite no legal authority demonstrating that Defendants were forbidden from indirectly paying all of the Plaintiffs through Felipe, the head of the household.

Additionally, Plaintiffs have the burden of proving that they worked hours for which they did not receive minimum wage. *Mendez v. Brady,* 618 F.Supp. 579, 584 (W.D.Mich.1985). Plaintiffs rely upon the literal language of *Mendez,* which states that it is the plaintiff's "burden of proving that each of them performed work for which he was improperly compensated." *Id.* Plaintiffs argue that they were likewise improperly compensated, but do not explain how. The plaintiffs in *Mendez* met their burden of proving they were improperly compensated by demonstrating that they had not consistently earned minimum wage. *Id.* Assuming that Defendants were entitled to pay Felipe on behalf of the entire family, Plaintiffs, in contrast to *Mendez,* do not submit evidence demonstrating that the checks Felipe received from Defendants did not amount to minimum wage for each member of the household that worked.

Thus, the Court denies Plaintiffs summary judgment concerning a violation of § 206(a).

### D. *The Court Grants in Part and Denies in Part Plaintiffs' Motion for Summary Judgment Of their MSAPWA Claims and Grants in Part and Denies in Part Defendants' Motion Summary Judgment Regarding the MSAPWA Claims.*

At issue is whether Defendants are "agricultural employers" under MSAPWA, are "recruiters" under 29 U.S.C. § 1821(a), violated the 29 U.S.C. § 1822(a) requirement that Defendants pay wages when due, violated the record keeping provisions of 29 U.S.C. §§ 1821(d)(1) and 1831(c)(1) and violated the health and safety provisions of 29 U.S.C. § 1823(a). For the reasons stated below, the Court will grant summary judgment in favor of Plaintiffs with respect to the issues of whether Defendants are agricultural workers and violated the record keeping provisions. The Court will grant in part and deny in part Plaintiffs' Motion for Partial Summary Judgment with respect to the issues of whether Defendants failed to pay wages when due and violated the health and safety provisions. The Court grants summary to Defendants on the issue of whether they were recruiters.

#### 1. *Agricultural employers*

■ MSAPWA governs the activity of "agricultural employers." An "agricultural employer" is "any person who owns or operates a farm, ranch, processing establishment, cannery, gin, packing shed or nursery, or who produces or conditions seed, and who either recruits, solicits, hires, employs, furnishes, or transports any migrant or seasonal agricultural worker." 29 U.S.C. § 1802(2).

In their Motion for Summary Judgment, Defendants ask the Court to find that they are not "agricultural employers" because they do not "employ" migrant or seasonal agricultural workers. This issue is easily disposed of since the Court has already determined that Plaintiffs are "employees" of Defendants. Even if the Court had found that Plaintiffs were independent contractors, there still would have been no genuine dispute as to the issue of whether Defendants were agricultural employers. Defendants admit to having hired Gary Bargeron and Jason Scrzynsinski as employees. (FPI 45 & RP at 17–18). In Opposition to Plaintiffs' Motion, Defendants ridiculously argue that the hiring of Bargeron and Scrzynsinski did not deem them agricultural employers because those employees "are local boys who are hired for the summer." (Dft's Opp. at 16). In other words, Defendants effectively admit that Bargeron and Scrzynsinski are "seasonal agricultural workers," bringing Defendants squarely within the definition of "agricultural employers."

#### 2. *Recruiters*

■ The Court grants summary judgment in favor of Defendants on Plaintiffs' 29 U.S.C. § 1821(a) claim. Section 1821(a) requires that "recruiters" disclose certain information in writing, concerning the terms of employment of workers being recruited. It is undisputed in this case that Defendants did not recruit Plaintiffs' services. Plaintiffs sought employment with Defendants after being informed of Defendants' operation by a stranger at a Meijer store. Furthermore, the term "recruit" as used in § 1821(a) is not synonymous with "hire" or "employ."

Plaintiffs argue that the term 'recruit' under 29 U.S.C. § 1821 does not require proof of advanced recruitment but is equivalent to 'hiring' of plaintiffs. This argument is unpersuasive. The statute does not define the term 'recruit'. However, the legislative history contemplates that disclosure under 29 U.S.C. § 1821(a) would occur before the actual migration to the work site:

'In the case of most migrant agricultural workers this recruitment and accompanying disclosure will occur before the worker leaves his permanent place

of residence, although it may also occur en route as in the case of the migrant family on their way to employment in a distant state which learns from a recruiter while traveling that better work is available at a different destination. The [purpose of the disclosure provision is] to ensure that workers to the greatest possible extent have full information about where they are going and what the conditions will be when they arrive before they begin their journey.' H.R.Rep. No. 97–885, supra at 14, reprinted in 1982 U.S.C.C.A.N. at 4560.

The AWPA's legislative history makes clear that the purpose of the disclosure provisions is to permit the migrant workers to make informed choices about offers of employment before traveling great distances to harvest crops. There is nothing in the legislative history to suggest that the recruitment phase continues right up to the time the workers are actually hired by the employer. The 'recruitment' of a migrant worker ends when the employee leaves his place of permanent residence, or while traveling to the employment destination.

*Avila v. A. Sam & Sons,* 856 F.Supp. 763, 772 (W.D.N.Y.1994), *aff'd Avila v. A. Sam & Sons Produce Co., Inc.,* 60 F.3d 812 (2nd Cir.1995).

The Court, therefore, denies Plaintiffs' Motion for Partial Summary Judgment with respect to the issue of whether Defendants violated § 1821(a), and grants Defendants' Motion for Summary Judgment on that issue.

### 3. Payment of wages when due

■ Section 29 U.S.C. § 1822(a) requires agricultural employers to pay wages owed when due. Plaintiffs claim that Defendants violated § 1822(a) by failing to pay them minimum wage and by failing to make Social Security Benefits on their behalf. Since the Court has already declined to grant summary judgment on the issue of whether Defendants violated § 206(a) by failing to pay minimum wage, the Court will also deny summary judgment of Plaintiffs' § 1822(a) minimum wage claim.

■ The Court will, however, grant summary judgment on Plaintiffs' § 1822(a) claim with respect to Defendants' failure to make Social Security contributions on Plaintiffs' behalf. Defendants admit that they did not make such contributions. (Admission No. 34 & FPII at 50). "[F]ailing to pay the employer's share of an agricultural worker's FICA tax violates 29 U.S.C. § 1822(a), and thus plaintiffs are entitled to summary judgment on this AWPA claim." *Sanchez v. Overmyer,* 845 F.Supp. 1183, 1187 (N.D.Ohio 1993).

### 4. Record keeping

■ The Court grants Plaintiffs summary judgment on their claims that Defendants violated 29 U.S.C. §§ 1821(d)(1) and 1831(c)(1). Those sections identically required Defendants to, *inter alia,* make, keep and preserve for a three year period the number of hours Plaintiffs worked. Defendants were additionally required to "provide to each such worker for each pay period, an itemized written statement of [this] information...." Sections 1821(d)(2) & 1831(c)(2). Defendants admit that they did not make, keep or preserve the number of hours Plaintiffs worked. (FPI at 89, FPII at 75 & Admission No. 31).

### 5. Health and safety

Plaintiffs' final request is for summary judgment of their claims that Defendants violated the health and safety provisions of 29 U.S.C. § 1823(a), which require:

Except as provided in subsection (c) of this section, each person who owns or controls a facility or real property which is used as housing for migrant agricultural workers shall be responsible for ensuring that the facility or real property complies with substantive Federal and State safety and health standards applicable to that housing.

The Court grants in part and denies in part Plaintiffs' Motion for summary judgment of this claim.

■ Defendant's failure to comply with State safety and health standards is evidenced by Michigan Department of Health, Bureau of Environmental and Occupational Health inspection reports. (Plt's Exhs. 7 & 8). Those reports document violations with respect to unit 10, where Plaintiffs stayed. (Dft's Ans. to 2nd Roggs at 1). A September 5, 1996 report indicated that Unit 10, with its 14 occupants, was grossly overcrowded. Defendants were ordered to eliminate the overcrowding, as well as to eliminate a drop cord light over the entrance, provide a second functioning stove and refrigerator and to replace broken light fixtures. The overcrowding continued the following year. The August 25, 1997 report indicated that there were 16 people living in Unit 10 (9 adults and 7 children), with only 6 beds.

Other violations were found that affected all of the residents. The September 5, 1996 report stated that residents did not have sufficient hot water and Defendants were ordered to install another hot water heater. Also insufficient to accommodate occupancy were the toilets. Defendants were ordered to install at least one new toilet. Electrical violations were identified, particularly at the shower building, on September 17, 1996, July 18, 1997 and August 25, 1997.

Also on July 18, 1997, which was during the outbreak of Shigellosis, numerous waste problems were identified. It was reported that children would urinate and defecate in the showers. Defendants were ordered to:

clean shower drains and stalls daily! This is to keep waste water from accumulating. Portions of the floor in the 'dry dressing' areas adjacent to the showers are raised, causing waste water to pond when it overflows from showers with blocked drains. THIS IS VERY IMPORTANT.

(emphasis in original). On another page, the inspector emphasized that the plugged up drains put the user of the ladies shower "in direct contact with waste water."

Defendants also violated 29 C.F.R. § 1928.110(c), which requires agricultural workers to provide water for drinking and handwashing in the field. Floyd admitted that Defendants provided no drinking or handwashing water in the field. (Admission No. 28 & FPII at 134). Accordingly, there is no issue of dispute that Defendants violated § 1928.110(c).

■ Section 1928.110(c) additionally requires agricultural workers to provide toilet facilities within a quarter mile of the field. Plaintiffs acknowledge that there were toilet facilities but state that they were inaccessible. Angel testified that Plaintiffs would have been required to circumvent a deep ditch filled with water and weeds, including poison ivy, to access to the toilets. (AE at 22–23). Affiants Brown and Davila testified that toilet facilities were available in the field. (TB at ¶ 4, LD at ¶ 9). The Court finds that this record presents an issue of fact regarding whether Defendants violated the portion of § 1928.110(c) requiring toilet facilities.

## IV. *Order*

For all the reasons cited above, the Court:

A. Grants Plaintiffs' Motion for Partial Summary Judgment with respect to the following issues:

1. Whether Plaintiffs were employees of Defendants under FLSA and MSAWPA;

2. Whether Defendants violated the record keeping provisions of FLSA, found at 29 U.S.C. § 211(c);

3. Whether Defendants violated 29 U.S.C. § 1822(a) by not making Social Security contributions on behalf of Plaintiffs;

4. Whether Defendants violated 29 U.S.C. §§ 1821(d) and 1831(c) by

failing to make, keep and preserve the number of hours Plaintiffs worked and failing to provide Plaintiffs with such a record; and

5. Whether Defendants violated 29 U.S.C. § 1823(a) by failing to ensure that the camp facilities complied with Federal and State safety and health standards, with the exception of Plaintiffs' claim that Defendants did not provide toilet facilities in the field.

B. Denies Plaintiffs' Motion for Partial Summary Judgment with respect to the following issues:

1. Whether Defendants violated the minimum wage provision found in 29 U.S.C. § 206(a);

2. Whether Defendants violated 29 U.S.C. § 1821(a), regarding recruiters;

3. Whether Defendants violated 29 U.S.C. § 1822 by failing to pay Plaintiffs minimum wage;

4. Whether Defendants violated 29 U.S.C. § 1823(a) by failing to provide toilet facilities in the field.

C. Grants Defendants' Motion for Summary Judgment with respect to the their claim that they are not "recruiters" subject to the requirements of 29 U.S.C. § 1821(a)

D. Denies Defendants' Motion for Summary Judgment in all other respects.

**IT IS SO ORDERED.**